**In re Neil RITCHIE and Teresa Ritchie, Debtors.**

**Neil Ritchie and Teresa Ritchie, Plaintiffs,**

**v.**

**Northwest Education Loan Assn., Defendant.**

**Neil Ritchie and Teresa Ritchie, Plaintiffs,**

**v.**

**Student Loan Fund of Idaho, Inc., Defendant.**

**Bankruptcy No. 99–41251. Adversary Nos. 00–6154, 00–6155.**

United States Bankruptcy Court, D. Idaho.

Nov. 9, 2000.

Brent T. Robinson, Ling, Nielsen & Robinson, Rupert, Idaho, for Plaintiffs.

Ron Kerl, Service Gasser & Kerl, Pocatello, Idaho, for Defendant Northwest Education Loan Association

Judson W. Tolman, Fruitland, Idaho, for Defendant Student Loan Fund of Idaho, Inc.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background.

Neil and Teresa Ritchie ("Plaintiffs") filed for relief under Chapter 13 on July 29, 1999.[1] An order confirming Plaintiffs' Chapter 13 plan was entered by this Court on May 30, 2000. Plaintiffs commenced these adversary proceedings against Student Loan Fund of Idaho ("SLFI") and Northwest Education Loan Association ("NELA")[2] (collectively "Defendants") on May 11, 2000, seeking a declaration from the Court that their obligation to repay their student loans should be discharged pursuant to Section 523(a)(8) of the Bankruptcy Code.[3] A trial was held October 6, 2000, at which the parties submitted evidence and testimony, at the conclusion of which the Court took the issues under advisement. This Memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

### II. Facts.

Neil Ritchie is 46 years of age. Teresa Ritchie is 43. They have been married for

---

1. The parties stipulated that Plaintiffs' Chapter 13 petition, schedules, statement of affairs and Chapter 13 plan be made a part of the record in these adversary proceedings.

2. Plaintiffs brought separate adversary proceedings against Defendants. The parties have agreed to consolidate these proceedings for the purposes of trial and disposition.

3. Plaintiffs seek to discharge only those amounts remaining due to Defendants upon Plaintiffs' completion of their confirmed Chapter 13 plan. Plaintiffs agree that Defendants can continue to receive payments as unsecured creditors under their plan. Of course, Plaintiffs are not entitled to discharge any of their indebtedness unless they receive a discharge under Section 1328(a), upon successful completion of their payments, or under Section 1328(b), a so-called "hardship discharge." The Ninth Circuit Bankruptcy Appellate Panel has held that even though discharge is not granted until the completion of a Chapter 13 plan, an action to determine the dischargeability of a student loan is not premature. *United Student Aid Funds, Inc. v. Taylor (In re Taylor)*, 223 B.R. 747, 751–52 (9th Cir. BAP 1998).

25 years. Plaintiffs have five children, but only two sons, ages 16 and 14, live at home. Mr. Ritchie received his student loans while attending a local junior college in 1982. Mrs. Ritchie received her student loans while attending the same junior college in 1992. She earned an associate degree and later attended Idaho State University. Mr. Ritchie owes SLFI $12,796.11 as of June 23, 2000. SLFI's Exhibit B. Mrs. Ritchie owes NELA $20,626.91 as of October 4, 2000. NELA's Exhibit C–2.

Mr. Ritchie is currently employed by Modular Training Methods, Inc., a firm that has contracted with the Idaho Department of Vocational Rehabilitation to assist people with physical and mental disabilities in finding and retaining jobs. Plaintiff's Exhibit 2. Mr. Ritchie received a $2.00 per hour raise in April and currently earns $10.00 per hour. He has earned $10,069.73 after taxes and payroll deductions as of September 8, 2000. Defendant SLFI's Exhibit C. Mrs. Ritchie is a manager of Snyder's Surplus, Inc. Plaintiff's Exhibit 2. She earns $7.00 per hour, together with a 5% commission on sales, and has earned $15,045.97 after taxes and payroll deductions as of September 15, 2000. SLFI's Exhibit D. Plaintiffs reported Adjusted Gross Income of $8,340.75, $11,647.35 and $27,976.40 on their Federal income tax returns for 1997, 1998 and 1999 respectively. Plaintiffs' Exhibit 5. They expect to make more money this year than in previous years.

Plaintiffs' monthly expenses total $2,684.00. Plaintiffs' Exhibit 6. Plaintiffs pay $300 to the Chapter 13 Trustee for disbursement to creditors under their confirmed plan. Each month, Plaintiffs contribute $315 to their church. They also monthly pay $50 for cable television; $240 for food; $80 for school lunches; $65 for life insurance; $55 for accident insurance; $70 for hospital bills; $384 for health insurance; $300 for house maintenance and repairs; $90 for car insurance; $240 for transportation; $90 for telephone service; $20 for Internet service; $160 for electricity; $50 for natural gas; $50 for payments on Mr. Ritchie's wheelchair; $60 for eye care; and $65 to a health club for Mr. Ritchie's therapeutic use of a hot tub and exercise equipment. Plaintiffs' Exhibit 6.

Mr. Ritchie suffers from chronic pain in his chest and back from a crush injury which occurred in 1984. Plaintiffs' Exhibit 7. He broke his back in 1999. Plaintiffs' Exhibit 7. Since August 2000, Mr. Ritchie has required the use of a cane or wheelchair to get around. Plaintiffs' Exhibit 7. His injury requires him to visit his doctors at least once every other month. Plaintiffs' Exhibit 7. In 1999, Mr. Ritchie was diagnosed with glaucoma and had cataract surgery. Plaintiffs' Exhibit 7. He also suffers from iritis, an inflamation of the eye. Plaintiffs' Exhibit 7. Due to the poor condition of his vision, Mr. Ritchie no longer drives at night and he wears sunglasses when in sunlight or near bright lights. Plaintiffs' Exhibit 7. He visits two eye doctors several times per month. Plaintiffs' Exhibit 7. A medical release issued by his doctor admitted in evidence indicates Mr. Ritchie is permanently restricted from working with his arms above the shoulder, repeated bending forward and lifting greater than twenty pounds. Plaintiffs' Exhibit 8. However, Mr. Ritchie's medical condition does not substantially hinder his ability to work in his current job. Plaintiffs' Exhibit 7.

According to the evidence, there are at least four repayment options available to student borrowers. NELA's Exhibit C–5. Plaintiffs' combined student loan balance is $33,423.02.[4] Under the Standard Repayment Plan borrowers pay a fixed sum over 120 months. Under this plan Plaintiffs would be required to pay $409.94 per

---

**4.** As mentioned, Plaintiffs each have separate student loans. However, based upon the information given the Court at trial, it appears proper that, for the purposes of this analysis, the Court treat Plaintiffs' loans as consolidated.

month.[5]  Under the Extended Repayment Plan the borrower pays a fixed sum over 240 months.  Under the Extended Plan Plaintiffs' payment would be $284.79.  The third option is the Graduated Repayment Plan where the borrower makes monthly payments that increase every two years over a 240 month period.  Plaintiffs' payment would start at $229.78 per month under this plan.  Finally, a borrower may qualify for an Income Contingent Repayment Plan, where the amount of the required monthly payment is recalculated yearly based on the borrower's Adjusted Gross Income, family size and the "poverty guidelines" promulgated by the United States Department of Health and Human Services.  The repayment period covers a maximum of 300 months.  The amount of payments are dependent on the borrower's income and may be nothing if the borrower has little income.  The balance remaining after the 300 month period is deemed discharged.  Plaintiffs would currently have to pay $187.94 per month under this plan.

### III. Discussion.

Generally, student loans are not dischargeable in Chapter 13.  11 U.S.C. § 1328(a)(2); § 1328(b)(2).  As provided by 11 U.S.C. § 523(a)(8), an individual debtor shall not be discharged from any debt:

for an educational benefit, overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this para-

graph will impose an undue hardship on the debtor and the debtor's dependents. . . .

■ In interpreting whether excepting a student loan from discharge under Section 523(a)(8) imposes an undue hardship on the debtor, the Ninth Circuit has adopted the so-called *Brunner* test.  *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir.1998).  *Brunner* established a three prong analysis to determine whether repayment of student loans creates an undue hardship: (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the loans;  (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans.  *In re Brunner,* 46 B.R. 752, 756 (S.D.N.Y.1985), *aff'd* 831 F.2d 395, 396 (2d Cir.1987).  The debtor bears the burden of proof on all three elements.  *Pena,* 155 F.3d at 1111;  *United Student Aid Funds, Inc. v. Nascimento (In re Nascimento)*, 241 B.R. 440, 445 (9th Cir. BAP 1999);  *Bryant v. Wells Fargo Bank (In re Bryant)*, 99.3 I.B.C.R. 118, 119 (Bankr.D.Idaho 1999).

### A. Minimal Standard of Living.

■ A minimal standard of living requires more than a showing of tight finances.  *Weil v. U.S. Bank et al. (In re Weil)*, 00.2 I.B.C.R. 110, 111 (Bankr.D.Idaho 2000) (quoting *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 314 (Bankr.W.D.Wis.1999)).  Debtors are expected to live within the

**5.** Defendant NELA's Exhibit C–5 indicates that an Interactive Repayment Calculator, available through the U.S. Department of Education's website, may be used to calculate monthly payments. http://www.ed.gov/DirectLoan/RepayCalc/dlentry2.html. The Court inserted Plaintiffs' combined student loan balances, 1999 tax information and assumed a maximum interest rate of 8.25 percent to cal-

culate the monthly payment under each repayment option.  The Court notes as of the writing of this decision, the above website indicates the current interest rate is 8.19 percent.  Because interest rates on student loans are subject to change, the Court believes it is necessary, for the purposes of this analysis, to use the maximum interest rate.

strictures of a frugal budget in the foreseeable future. *Weil*, 00.2 I.B.C.R. at 111 (quoting *Healey v. Massachusetts Higher Education (In re Healey)*, 161 B.R. 389, 393 (E.D.Mich.1993)). In deciding whether Plaintiffs can maintain a minimal standard of living if required to repay the student loans, the Court looks to the Plaintiffs' monthly income and expenses. *Pena*, 155 F.3d at 1112; *Weil*, 00.2 I.B.C.R. at 111.

### 1. Income.

■ Plaintiffs' income is subject to fluctuation. Where the debtors' income will fluctuate the Court may, in its discretion, average debtors' income. *Pena*, 155 F.3d at 1112.[6] Mrs. Ritchie's pay includes overtime and commissions. According to Plaintiffs' Exhibit 4 she has earned $15,045.97 over the course of eighteen pay periods.[7] This averages $835.89 per pay period, or $1671.78 per month. Also, the number of hours Mr. Ritchie has worked has fluctuated.[8] After taxes and payroll deductions, Mr. Ritchie's year to date income is $10,069.73 over sixteen pay peri-

ods. Plaintiffs' Exhibit 3. The record shows that Mr. Ritchie received a $2.00 per hour pay increase in April of this year. Following this pay increase Mr. Ritchie has averaged $647.18 per pay period, or $1294.36 per month.[9] Therefore, the Court finds Plaintiffs' combined average income is $2966.14 per month for purposes of this analysis.

### 2. Expenses.

### a. Non-tithing Expenses.

Plaintiffs' Exhibit 6 lists expenses totaling $2,684 per month.[10] The Court notes Plaintiffs include no clothing item in their budget. Plaintiffs testified their sons, through their own part-time job earnings, are able to pay for most or all of their clothing and school expenses. Plaintiffs purchase much of their clothing at thrift stores. While Plaintiffs' efforts at economy are commendable, it is probably unrealistic to completely exclude a monthly clothing expense. The Court is also concerned Plaintiffs' food budget may be low considering Plaintiffs have two teenage sons. However, some other expenses in

---

**6.** The Court notes averaging is a conservative approach in analyzing Plaintiffs' income in this case since Plaintiffs are earning more now than they have in the past. As the Ninth Circuit has stated "[t]o require strict reliance upon conditions existing at the moment of trial could result in an accurate snapshot but a distorted picture." *Pena*, 155 F.3d at 1112. Also, it is probably necessary to average income in order to compare it to the Plaintiffs' expenses. Plaintiffs testimony implies they have averaged their expenses in preparing their budget, rather than relying on expenses from a recent month.

**7.** Plaintiffs' Exhibit 4 begins with the pay period from February 16 to February 29 and ends with the pay period from September 1 to September 15, covering fifteen pay periods. Presumably, Mrs. Ritchie was paid twice in January and once more for the first two weeks of February. The Court arrived at Mrs. Ritchie's average monthly pay by dividing her year to date pay, net of taxes and payroll deductions, by the number of pay periods, then multiplying by two. Plaintiffs' Exhibit 1 shows Mrs. Ritchie has worked for her current employer since August of 1999.

**8.** Plaintiffs' Exhibit 3 shows Mr. Ritchie has worked as many as eighty-three hours to as few as fifteen and one half during his two week pay periods this year.

**9.** Mr. Ritchie worked only fifteen and one half hours for the pay period ending September 8. He testified that this was an exception; he tries to work at least thirty-two hours per week, and that he did not expect this to happen again. The record bears this out, Mr. Ritchie worked more than thirty-two hours per week in 9 of the 10 pay periods from April 10 to August 25. The Court, in its discretion, believes it is appropriate to exclude the pay period ending September 8 for the purposes of averaging Mr. Ritchie's income.

**10.** Plaintiffs' income and expenses are both significantly higher than what was listed in their bankruptcy schedules. The Court will use the figures submitted during the trial for this analysis. *Brunner* requires an analysis of Plaintiffs' *current* income and expenses to determine whether they are able to maintain a minimal standard of living. Plaintiffs schedules were submitted in August of 1999.

Plaintiffs' monthly budget seem a bit high. For instance, Plaintiffs budget $240 per month for upkeep on their automobiles and $90 per month for phone service. On balance, and excluding tithes, the Court concludes Plaintiffs' overall budget is not excessive and includes no extraordinary items. The Court will accept Plaintiffs' position that they can live within these means.

### b. Tithing Under Section 523(a)(8).

A key dispute between the parties in this case involves how the Court should treat Debtors' religious contributions in its undue hardship analysis Section 523(a)(8). Plaintiffs testified their church does not require them to tithe to enjoy the benefits of membership. Rather, Plaintiffs contribute monthly to their church as a matter of choice, and feel so strongly about doing so that they make their contributions before payment of their other living expenses. Defendants contend the amount donated monthly should be considered available to pay on the student loans. Plaintiffs contend that in calculating whether Plaintiffs can afford to pay their student loans, the Court should allow the tithes as a regular monthly expense. Plaintiffs also contend Defendants are not prejudiced by their practice of tithing, since the amount donated is generated by reducing other necessary costs of living.

On this record, and even without considering Plaintiffs' monthly donation to the church, it appears Plaintiffs would be able to sustain a minimal standing of living and pay off their student loans under the Income Contingent Repayment Plan. Plaintiffs' average income exceeds their budgeted expenses including tithing by some $282 per month. In fact, Plaintiffs come close to having sufficient disposable income to repay under the Extended Plan, and would also be able to make payments under the Graduated Plan for eight years if their

income and expenses remain the same. Assuming, though, that Plaintiffs' budget is so austere as to be unrealistic, and that all their income must be devoted to paying living costs, the Court must consider whether the tithes are available to fund student loan payments.

■ The parties did not cite, nor has the Court been able to locate, any binding authority concerning whether charitable contributions should be considered in undue hardship determinations. In a recent case, Judge Myers noted this Court would defer passing upon the question of whether charitable contributions should be considered under the *Brunner* analysis where the debtor's charitable contributions were de minimis. *Wegrzyniak v. United States et. al. (In re Wegrzyniak)* 241 B.R. 689, 694 n. 4 (Bankr.D.Idaho 1999). Here, however, Plaintiffs' tithes are not de minimis, amounting to almost $3,800 per year. By excluding their tithes, Plaintiffs could conceivably make the monthly payment required under the Standard Repayment Plan and maintain a minimal standard of living.[11] So the question presented is whether Congress intended that debtors seeking to discharge student loans be able to make significant charitable donations. As explained below, the Court construes Section 523(a)(8) to exclude such donations from determining Plaintiffs' available income under the undue hardship analysis.

■ The interpretation of the Code begins with the language of the statute itself. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Bates v. United States,* 522 U.S. 23, 29–30, 118 S.Ct. 285, 139 L.Ed.2d 215

---

11. Plaintiffs' monthly tithe of $315 added to the $282 of income over and above their monthly expenses would allow them make the

$409.94 payment to Defendants with money to spare.

(1997) (internal references and alterations omitted). The plain language of Section 523(a)(8), as quoted above, makes no reference at all to the treatment to be given religious or charitable contributions in making undue hardship determinations. Elsewhere in the Code, though, the topic of charitable contributions is specifically addressed.

In 1998, with the passage of the Religious Liberty and Charitable Donation Protection Act ("RLCDPA"), Congress amended several sections of the Bankruptcy Code to exclude charitable contributions of up to fifteen percent of the debtor's adjusted gross income from consideration by the bankruptcy courts for various purposes. Pub.L. No. 105–183, 112 Stat. 517 (codified as amended in scattered sections of 11 U.S.C.). For example, Congress amended Section 707(b) to make clear that the bankruptcy court should not consider a debtor's modest charitable contributions in determining whether to dismiss a Chapter 7 case for "substantial abuse." 11 U.S.C. § 707(b). Congress also amended Sections 544(b) and 548(a) to insulate such charitable gifts from avoidance by a trustee as fraudulent conveyances. 11 U.S.C. §§ 544(b)(2), 548(a)(2), 548(d)(2)-(4). Congress also declared that charitable contributions should not be considered "disposable income" by the bankruptcy court in determining the amount of required payments by a debtor to creditors under a Chapter 13 plan. 11 U.S.C. § 1325(b)(2)(A). Clearly, then, Plaintiffs can argue that a debtor's ability to engage in some charitable giving while in bankruptcy is a practice Congress sought not only to preserve, but to encourage. Notably, though, Section 523(a)(8) was not among the Code provisions targeted by Congress for change in 1998 or since.

Other jurisdictions have examined the debtor's practice of tithing in connection with Section 523(a)(8). In a decision rendered before the 1998 amendments to the Bankruptcy Code, *Lynn v. Diversified Collection Serv. (In re Lynn)* 168 B.R. 693 (Bankr.D.Ariz.1994), the court concluded that the debtor failed to meet her burden of proof on whether tithing may be considered under Section 523(a)(8). *Id.* at 700. The court also determined that Section 523(a)(8) is a neutral law that was not designed to promote or restrict religious beliefs, thereby rejecting the debtor's arguments that she should be allowed to tithe under the First Amendment to the Constitution. *Id.*

Following the passage of RLCDPA, another court allowed a $60 per month tithe as permissible under RLCDPA despite the absence of any amendment to Section 523(a)(8) indicating tithing should be considered an appropriate expense. *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 273 (Bankr.E.D.N.Y. 1998). This court's conclusion was reached without consideration of the plain language of Section 523(a)(8) and the principles of statutory interpretation enunciated in *Bates,* and no indication was given by the court why the provisions of RLCDPA should be applied Section 523(a)(8).[12]

In *Educational Credit Management Corp. v. McLeroy (In re McLeroy),* 250 B.R. 872, 880 (N.D.Tex.2000), the court held RLCDPA does not apply to Section 523(a)(8) and debtors are not entitled to automatically refer to their tithing practices as an appropriate expense under the undue hardship test. This holding was based upon an analysis of the plain language of Section 523(a)(8) and the RLCDPA amendments, and after a careful review of RLCDPA's legislative history

**12.** While obviously speculation, the Court suspects the lack of reasoning in *Lebovits* stems from the de minimis nature of the charitable contributions. The debtor was making charitable contributions of $60 per month, while the court found his income and expenses were $4683.11 and $6341.00 respectively.

*Lebovits,* 223 B.R. at 270. The Court does not condone a de minimis exception to the analysis set forth here. The Court merely notes that in depth analysis of whether RLCDPA has any affect on Section 523(a)(8) may not have been necessary when tithing had a de minimis affect.

where the court found no reference to Section 523(a)(8). *Id.* at 879–882. This Court concludes *McLeroy* is "better reasoned" than *Lebovits*, and adopts its holding here.

There are other reasons supporting this Court's interpretation of the statute. For one thing, while Congress did not address the right to tithe in Section 523(a)(8) in the 1998 legislation, Congress did amend Section 523(a)(8) in other ways that year. Former Section 523(a)(8)(A), which provided for discharge of student loans which had become due seven or more years prior to the filing of the bankruptcy petition, was removed from the Bankruptcy Code. Pub.L. No. 105–244, 112 Stat. 1581. The lack of amendment to Section 523(a)(8) declaring charitable contributions to be an appropriate expense while at the same time Congress deleted the seven year provision of former Section 523(a)(8) and amended other provisions of the Code to accommodate charitable giving persuades the Court that Congress did not intend further changes to the Section 523(a)(8) undue hardship analysis.

Finally, it should be observed that the exception to discharge embodied in Section 523(a)(8) protects a special class of creditor: student loans from, insured by or guaranteed by the government or nonprofit institutions. Even assuming that Congress intended through the other 1998 amendments that creditors in general bear the brunt of a debtor's decision to engage in charitable giving, it cannot be assumed that Congress intended that the special class of creditors described in Section 523(a)(8) should suffer discharge as a result of the practice. All factors considered, the Court construes Section 523(a)(8) to exclude religious and charitable donations as a proper expense item in determining whether a debtor would be unduly burdened by not discharging qualifying student loan debt.

■ Excluding tithes as an expense, and accepting Plaintiffs' budget, Plaintiffs have nearly $600 per month of income over and above their expenses. This is more than enough to repay their student loans under the Standard Repayment Plan. Under these circumstances, the Court concludes Plaintiffs have failed to show they cannot maintain a minimal standard of living based on their current income and expenses if required to repay their student loans.[13]

**B. Additional Circumstances.**

■ The second prong of the *Brunner* test requires Plaintiffs to show their current state of affairs will not improve for a significant part of the student loan repayment period. *Weil,* 00.2 I.B.C.R. at 111. Under the Court's analysis above, Plaintiffs are able to maintain a minimal standard of living if required to pay off their student loans. The Court also concludes Plaintiffs have failed to show they will suffer a change in this regard in the future.

Plaintiffs testified they were earning more income this year than they had in years past. The record certainly bears this out. As stated above, as of mid-September, Plaintiffs' income, net of taxes and payroll deductions, is over $25,000. But, also as stated above, Plaintiffs' income fluctuates, and according to their

---

**13.** The Court's holding is confined to whether tithing is an appropriate expense in determining whether Plaintiffs are able to maintain a minimal standard of living if required to repay their student loans under Section 523(a)(8). The Court's holding does not presume to affect, as Plaintiffs put it, their "constitutional right to practice their religion." Plaintiffs alone can decide whether they can or should make donations to their church, and the Court does not presume to interfere with that decision. Plaintiffs did not directly argue that Section 523(a)(8) as applied to these facts is unconstitutional, and the Court does not decide the issue. Recall, however, that at least one court, in *Lynn, supra,* has decided that Section 523(a)(8) as applied under these facts is neutral, is not intended to prohibit the practice of religion, and does not violate Debtors' First Amendment rights. 168 B.R. at 700.

testimony, is arguably headed downward, or at least is not expected to rise. Mrs. Ritchie testified that she expected her wages to decrease because of the hiring of a new employee which will reduce her overtime hours. She testified she expected to make $1800 to $1900 per month in the future. The testimony also indicates Mr. Ritchie's income could decrease in the future as well, because of reduced hours from his health problems. Also, Mr. Ritchie is limited in the type of work he can perform. Plaintiffs' Exhibit 8.

Of the expenses Plaintiffs' list in their Exhibit 6 is a $50 monthly payment for Mr. Ritchie's wheelchair. Mr. Ritchie testified Plaintiffs bought the wheelchair for $250 or $300, and that they make $50 monthly payments on this debt. The first payment was made in September. By March of 2001 the wheelchair will presumably be paid off. Plaintiffs' confirmed Chapter 13 plan calls for $300 monthly payments to the trustee for five years. Plaintiffs will complete their plan in about four years. When questioned as to what would occur to this amount of money upon completion of the plan Plaintiffs testified it would be needed for Mr. Ritchie's medical expenses, or used to supplement other budget items. Plaintiffs testified they hoped their automobiles would last for the remainder of the plan, but that they would need new cars sometime in the foreseeable future.

The Court believes it is likely that Mr. Ritchie will generate less income in the future and is likely to face greater medical expenses. Plaintiffs' Exhibits 9 shows that Plaintiffs paid $1225.73 in co-payments, deductibles and other medical expenses not covered by their insurance in 1999. This figure rose to $3498.45 in 2000. Plaintiffs' Exhibit 10. However, Plaintiffs have made no showing that their income will drop and expenses will rise to the extent that the $282 excess in their current budget, the $315 tithe, $50 wheelchair payment and $300 monthly payment to the trustee will be needed to maintain a mini-

mal standard of living in the future. Therefore, Plaintiffs have failed to carry their burden of proof on this issue as well.

### C.  Good Faith.

*Brunner* requires Plaintiffs' to show they have made a good faith effort to repay their student loans. *Brunner,* 46 B.R. at 755. The debtor must make an effort to repay the loans or show that "the forces preventing repayment are truly beyond his or her reasonable control." *Id.* Lack of good faith was found where the debtor filed for bankruptcy shortly after payment on her loans became due, and because the debtor made virtually no effort to repay her loans or seek a deferment. *Brunner,* 46 B.R. at 758. "With the receipt of a government guaranteed education, the student assumes an obligation to make a good faith effort to repay these loans, as measured by his or her efforts to obtain employment, maximize income and minimize expenses." *In re Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993). But, "failure to make even minimal payments on student loans does not prevent a finding of good faith where the debtor never had the resources to make payments." *Brown v. Salliemae Servicing Corp. (In re Brown),* 227 B.R. 540, 546 (Bankr.S.D.Cal.1998), *aff'd in part, rev'd in part,* 239 B.R. 204 (S.D.Cal.1999).

Plaintiffs made sporadic payments to SLFI between 1984 and 1993 ranging from $15 to $51, for a total of $1291. SLFI's Exhibit G. In 1991 and 1992 SLFI received two offsets from Plaintiffs' tax refunds via the IRS for a total of $1461. SLFI's Exhibit G. SLFI has received two payments from the trustee totaling $493.62. SLFI's Exhibit G. Plaintiffs have also made some small payments to NELA since Mrs. Ritchie's first student loan was incurred on September 4, 1992. NELA has received a total of $1063, of which $813.02 was paid by the trustee under Plaintiffs' Chapter 13 plan. NELA's Exhibit C–2.

The Court was given no evidence to dispute Plaintiffs' testimony that had they

had the means to pay their student loans in the past they would have done so. The record only includes Plaintiffs' Adjusted Gross Income from 1997, 1998 and 1999. Mr. and Mrs. Ritchie originated their student loans in 1982 and 1992 respectively. Also, the Court does not dispute that Plaintiffs are making good faith efforts to maximize their income. Plaintiffs had higher Adjusted Gross Income in 1999 than in 1997 or 1998 and expect to make more this year. But, under their current budget, Plaintiffs now have the means to make some payment on their student loans. Currently their income exceeds their expenses by $282 per month. Plaintiffs testified that at some time past they inquired into paying their student loans and were told they must make minimum payments of $150 per month, which was more than they could afford. *See also* SLFI's Exhibit G. Mrs. Ritchie testified Plaintiffs had not applied for repayment under the Income Contingent Repayment Plan or other deferment programs, but she indicated that she was willing to do so. Also the record does not indicate Plaintiffs have ever sought a deferment.

According to their own expenses, including tithes, Plaintiffs now have the means to repay their loans under the Income Contingent Repayment Plan. Also, if Plaintiffs committed their tithes to repayment of their student loans they would be able to repay under the Standard Repayment Plan. Under these circumstances, the Court concludes Plaintiffs' have not carried their burden of showing they have made a good faith effort to repay their student loans.

The Court notes that should Plaintiffs face more severe economic circumstances in the future there are a number of ways their student loans may be discharged. For instance, under the Income Contingent Repayment Plan their monthly pay-

ment could be as little as zero if their income falls.[14] The term of the Income Contingent Repayment Plan is a maximum of 300 months, any remaining balance after 300 months is discharged. Also, the Department of Education website indicates that discharge may be granted in the case of total and permanent disability.[15]

### D. Partial Discharge.

At trial, the Court sought comment from counsel as to whether the Court could, if the facts supported it, issue a "partial discharge" of some, but not all, of Plaintiffs' student loans. Case law from the Ninth Circuit regarding partial discharge of student loans under the Bankruptcy Code is mixed. This Circuit's Bankruptcy Appellate Panel has ruled that bankruptcy courts may not grant a partial discharge in this situation. *United Student Aid Funds, Inc. v. Taylor (In re Taylor)* 223 B.R. 747, 753 (9th Cir. BAP 1998). But the District Court for the Southern District of California has held the bankruptcy courts may partially discharge student loans based upon a debtor's undue hardship. *Great Lakes Higher Education Corp. v. Brown (In re Brown)*, 239 B.R. 204, 212 (S.D.Cal. 1999). Other jurisdictions have allowed partial discharge of student loans under Section 523(a)(8). *See e.g. Kapinos v. Graduate Loan Center (In re Kapinos)*, 243 B.R. 271, 277 (W.D.Va.2000); *Williams v. Missouri S. State College (In re Williams)*, 233 B.R. 423, 430 (Bankr. W.D.Mo.1999).

As it turns out, this Court need not decide today whether it can engage in a partial discharge analysis since even if the statute authorizes such an approach, the facts show this is not an appropriate case to do so. Excluding their tithes as an appropriate expense, Plaintiffs have sufficient income to repay their student loans under the Standard Repayment Plan.

---

14. *See e.g.,* NELA's Exhibit C–5.

15. The Court was invited to consult the information on the site in connection with its

decision in this case. The site may be found at http://www.ed.gov/DirectLoan/pubs/plus-basc/plus8.html.

## IV. Conclusion.

For the reasons set forth in this Memorandum, Plaintiffs' student loans will not be discharged. Plaintiffs have not met their burden of proving that repaying their student loans would create an undue hardship. Plaintiffs failed to establish they could not maintain a minimal standard of living if required to payback their loans. Nor did Plaintiffs persuade the Court they had made good faith efforts to repay their student loans.

A separate form of judgment will be entered declaring Defendants' loans excepted from discharge.