**In re Valerie A. WILLIFORD, Debtor.**

**Valerie A. Williford, Plaintiff,**

**v.**

**Oklahoma State Regents for Higher Education, and HELP Service Group, Inc., Defendants.**

**Bankruptcy No. 03–10760–NLJ.**
**Adversary No. 03–1070–NLJ.**

United States Bankruptcy Court,
W.D. Oklahoma.

Sept. 8, 2003.

### ORDER ON PLAINTIFF'S ADVER-SARY COMPLAINT TO DIS-CHARGE STUDENT LOANS

NILES L. JACKSON, Bankruptcy Judge.

The captioned adversary case comes before the Court on the Complaint filed by Plaintiff–Debtor (hereinafter "Debtor") seeking to discharge her student loan obligations based upon "undue hardship" under 11 U.S.C. § 523(a)(8). The Court conducted a trial in this proceeding on July 10, 2003, at the conclusion of which the Court took the matter under advisement. Having reviewed the testimony, the evidence, and the applicable law, the Court rules as follows.

### THE FACTS

Debtor's direct testimony was proffered, by agreement, by reference to her trial brief filed July 1, 2003. Cross-examination was conducted and redirect testimony was presented in open court. The following facts were adduced:

1. The debtor has been a licensed lawyer in Oklahoma since 1999.

2. The specific obligations at issue include:

A. A loan currently held by HELP Service Group, Inc. (hereinafter "HELP") which was a "bar study loan." The original loan amount was $7,500 plus an origination fee, for a total of $8,025.87. As of May 14, 2003, the balance of this loan, with accumulated interest, was $8,629.40. The monthly payments are $82.97.

B. A series of student loans (now consolidated) which were used to pay law school tuition and living expenses. At the time these loans were consolidated, the principal balance was $62,262.05, and as of March 19, 2003, shortly before the date of trial, with accumulated interest the balance was $77,236.71. These loans are now held by Defendant Oklahoma State Regents for Higher Education (hereinafter "Regents"), on assignment from Sallie Mae Servicing Corp. Interest-only payments on the Regents' thirty-year loan (applicable for the first four years only, ending in December 2003) are $491.46 per month; payments in years 5 through 30 (when principal is added) increase to $878.00 per month. Debtor made her last payment in September 2001. HELP's Exh. C–014. Due to Plaintiff's pending bankruptcy, the loans are presently in "administrative forbearance," which forbearance will end February 2, 2004. HELP's Exh. C–012.

3. According to Debtor, the student loans were used to pay for tuition, books and living expenses. HELP's Exh. D–006. Of the $7,500 bar study loan, $5,000 was used for living expenses. HELP's Exh. F–004.

4. Debtor, presently 30 years old, was graduated from Oklahoma City University in 1996 with two degrees: a bachelor of music and a bachelor of arts. All expenses for these degrees were paid by her parents. She was graduated from Oklahoma City University School of Law in December 1998. Her parents did not assist her with expenses while attending law school. She testified she was also accepted to the University of Oklahoma College of Law (which is markedly less expensive than OCU) but chose to attend OCU instead.

5. Debtor passed the Oklahoma State bar examination on her second attempt in September 1999. She argued failing to pass the exam on the first attempt hindered her attempt to find employment.

6. Debtor's employment history since 1999 has not produced anything resembling a lucrative income. She testified she sent out approximately 1,000 resumes from 1996–2000 seeking legal employment, without meaningful results. She also applied for numerous non-legal jobs with no success. She worked as a law clerk for an attorney in 1998 for a few weeks during her final semester. She also interviewed with the law school's career counselor with no results.

Following law school graduation, Debtor worked for an attorney for six months handling immigration cases and small claims collection work, while still sending out resumes because her employment with that attorney was a "nightmare." She then worked for a mortgage company as a bankruptcy associate (a clerical position), earning approximately $10 per hour.

Thereafter, utilizing a Small Business Administration loan, she opened a private law practice in February 2001, specializing in bankruptcy and family law. She closed her practice eight months later when she could not pay the rent, her telephone service having been shut off a few weeks before.

Debtor then worked for a temporary employment service, earning $7–8 an hour, while working on a few legal cases during the evening hours using her cellular telephone to communicate with clients.

In January 2003, Debtor re-opened her private law practice in an office-sharing arrangement with another attorney. That arrangement requires her to do her own secretarial work. She testified she had 15–20 active cases as of the date of trial in the fields of bankruptcy, civil litigation, and family law. She said a few cases have been referred to her by her office-mate as well as by other attorneys she has met via the Oklahoma Bar Association's internet site (OBA–NET). She had placed an advertisement in the newspaper and on the OBA–NET.

Debtor testified that the most money she made was in 2000, when she earned $18,277, working full-time for an attorney and a part-time job on the weekends. In 2001 she earned $8,830 and in 2002 she earned $9,932. From January through June in 2003 she has earned $8,741.58.

7. Debtor has lived with her parents all her life (Schedule J indicates she pays no rent), believes she has health problems (cardiac) but has no health insurance, and drives a 1995 Ford Thunderbird. She makes a monthly payment of $157 on the vehicle, which is due to be paid off in December 2003 or January 2004. However, she believes the vehicle will have to be replaced before it is paid off because it has 159,000 miles on its odometer and requires the addition of oil to the engine every two weeks. She borrowed money from her parents twice last year to repair the vehicle. In her responses to interrogatories propounded by HELP, Debtor stated she has earned about $7,600 thus far this year and her current monthly expenses are $400 for office rent, $57 for telephone, $53 for car insurance, $300 for food, $50 for clothing, $150 for fuel and auto maintenance, and $80 in office supplies. She estimates she has spent $400 on medical expenses and $800 for advertising this year. HELP Exhibit C–005.

8. Debtor's Schedule F lists $128,162.60 owed to unsecured creditors as follows: four credit cards ($11,997.62), one line of credit ($5,398.51), a personal guarantee on an SBA loan ($23,564.56) and the student loan obligations ($87,201.91).

9. Debtor received her Chapter 7 discharge on May 8, 2003. Trustee originally filed a Report of No Distribution, indicating this was a "No Asset" case, but subsequently withdrew such report, asserting she had received documentation supporting the existence of assets in the case.

10. Debtor believes she will gross $20,000 this year, although in her responses to HELP's interrogatories submitted in June 2003, she said she expected her income to average about $2,000 per month over the next twelve months. HELP Exh. C–005. From that amount, she expects to pay $4,000 in social security, federal and state taxes. She will have $9,000 in office expenses (including the aforementioned $400 for rent and $57 for a cellular telephone), leaving her $7,000 in spendable income. She argues this is hardly sufficient to allow her a minimal standard of living, or to even make minimal student loan payments. She has no dependants, and no mental or confirmed physical disabilities that would impair her earning ability.

She testified she is "very busy" in her law practice this year with fifteen to twenty open files, but is just not making much money. Some clients do not or cannot pay her and she has other cases pending under a contingent fee agreement. She said she is not presently looking for employment with a law firm.

Debtor said she has made between ten and fifteen payments on her student loans since the loan repayment periods began in 1999. She has taken advantage of several periods of economic hardship deferrals of-

fered under the loan repayment plans, and has 36 months of deferrals remaining to be taken at her option. Due to those deferments, the current administrative forbearance due to her bankruptcy, and her payments, she is not in default on either obligation.

She acknowledged she received from Defendant Regents information on several other repayment plans applicable to hardship situations such as hers, but conceded she did not apply for them. She argued further deferrals are impractical because the interest would still accumulate. For that reason she declined to apply for the William D. Ford Federal Direct Consolidation Program under which she could make payments as low as $5 a month until she got on her feet financially.

## THE LAW

The applicable section of the Bankruptcy Code provides that:

> A discharge ... does not discharge an individual debtor from any debt ... for an educational ... loan made, insured or guaranteed by a governmental unit ... unless excepting such debt from discharge ... will impose an undue hardship on the debtor or the debtor's dependents ....

11 U.S.C. § 523(a)(8). Although the Tenth Circuit Court of Appeals has not addressed the legal standard that must be met to obtain a hardship discharge of a student loan, the most frequently cited case in other jurisdictions is *Brunner v. New York State Higher Educ. (In re Brunner)*, 831 F.2d 395 (2nd Cir.1987). This Court has previously adopted the *Brunner* standard in *Kloiber v. United States Department of Educ. (In re Kloiber)*, Case No. 93–14456–TS, Adv. No. 93–1350–TS (Bankr.W.D.Okla. Sept. 3, 1997) and *Skaggs v. Great Lakes Higher Educ.*

*Corp. (In re Skaggs)*, 196 B.R. 865 (Bankr. W.D.Okla.1996).

In an abbreviated opinion, the *Brunner* court adopted the following three-part test applied by the district court below it for determining existence of an "undue hardship" sufficient to discharge a student loan. The three-part showing that a debtor must make to establish the existence of undue hardship is:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

831 F.2d at 396. The *Brunner* court then discussed each prong of the three-part test.

In summarily addressing the first part of the test, the *Brunner* court noted that it "has been applied frequently as the minimum necessary to establish 'undue hardship' ... and [to require] such a showing comports with common sense as well." *Id.* (citations omitted).

The *Brunner* court then focused on the high burden of proof placed on the debtor by part two of the test:

> The further showing required by part two of the test is also reasonable in light of the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt. Predicting future income is, as the district court noted, problematic. Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of

continuing inability to repay over an extended period of time, more reliably guarantees that the hardship is 'undue'. 831 F.2d at 396. In surveying the published cases addressing this issue, the "undue" part of "undue hardship" appears to be the key focus. Several courts emphasize that "[i]t seems universally accepted, however, that 'undue hardship' contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy." *See United States v. Brown (In re Brown),* 18 B.R. 219, 222 (Bankr.D.Kan.1982), *cited with approval in Hatfield v. William D. Ford Fed. Direct Consolidation Program (In re Hatfield),* 257 B.R. 575, 580 (Bankr. D.Mont.2000). Further, "the existence of the adjective 'undue' in front of the word 'hardship' clearly indicates that Congress intended that the hardship experienced by the debtor must be very severe." *See Grine v. Texas Guaranteed Student Loan Corp. (In re Grine),* 254 B.R. 191, 196 (Bankr.N.D.Ohio 2000).

The Second Circuit Court of Appeals adopted the *Brunner* three-prong test, and placed special significance on the second prong thereof. In analyzing this prong, the Second Circuit stated that:

> The second prong of the Brunner test properly recognizes the potential continuing benefit of an education, and imputes to the meaning of "undue hardship" a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period. As the proponents of a higher standard for dischargeability recognized:
>
> > [E]ducational loans are different from most loans. They are made without business considerations, without security, without cosigners, and rely ˉfor repayment solely on the debtor's future increased income resulting from

the education. In this sense, the loan is viewed as a mortgage on the debtor's future.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 133 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6094. Accordingly, "the dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." ... "Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'" *In re Roberson,* 999 F.2d 1132, 1135—36 (7th Cir.1993) (quoting *Brunner,* 831 F.2d at 396) (citations omitted).

On the issue of the debtor having made a good faith effort to repay, the third prong of the *Brunner* test, Defendant Regents cited three court decisions in which student loan discharges were denied due to the failure of the debtor to apply to the William D. Ford Program or other similar loan restructuring programs. In reviewing these cases, the Court notes they involved other negative issues that precluded the debtors from obtaining their hardship discharge. The "failure to apply" argument was almost an afterthought on the part of the courts.

In the case of *In re England,* 264 B.R. 38 (Bankr.D.Idaho 2001), the court focused primarily upon the following facts: the co-debtor spouse refused to look for employment, and the student-loan debtor was chided for not looking for work that would pay him market rate wages. Further, the debtor received a worker's compensation settlement, but made no effort to apply it toward his loan payments. Finally, much of the tax refund received by debtor and his spouse was spent on dining out, home furnishings, purchasing a computer and

vacationing, instead of being used to make payments on the student loan.

The next case, *Ritchie v. Northwest Educ. Loan Ass'n. (In re Ritchie)*, 254 B.R. 913 (Bankr.D.Idaho 2000), involved facts where the debtors' income exceeded their expenses by $282 a month and the debtors had never sought a deferment. That court also suggested the debtors could apply their monthly church tithe of $300 to the student loans. *Id.* at 921. As to the Income Contingent Repayment Plan, the court simply offered this enticing tidbit of information to the debtors: "their monthly payment could be a little as zero if their income falls. The term of the Income Contingent Repayment Plan is a maximum of 300 months, any remaining balance after 300 months is discharged." *Id.* at 923.

In the *Swinney* case, the debtor testified she suffered from two mentally disabling conditions that prevented her from working but she offered no medical evidence of those conditions. *Swinney v. Academic Financial Servs. (In re Swinney)*, 266 B.R. 800, 805 (Bkrtcy.N.D.Ohio 2001). The court described her evidence relating to her mental disabilities as "bare allegations." *Id.* In further discussion, the court noted that the debtor's mental difficulties did not rise to the level necessary to qualify for social security disability benefits and that she still considered herself able to operate a motor vehicle, and concluded the debtor lacked credibility and her testimony lacked corroborating evidence. *Id.*

The *Swinney* court, having found the debtor failed to meet the three prongs of the *Brunner* test, continued its analysis. It stated that certain debtors who did not qualify for a hardship discharge might nevertheless "be entitled to have the terms of their student loan changed by the court (i.e., a reduction in the loan amount) so that the debtor may obtain some of the

benefits of a bankruptcy discharge." *Id.* at 805—06. As authority for molding a different remedy, the court cited the following language from *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*:

> Although the bankruptcy court should not have discharged the . . . entire student loans, we believe it had the power to take action short of total discharge. We find this authority in 11 U.S.C. § 105(a), which permits the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," so long as such action is consistent with the Bankruptcy Act. In a student-loan discharge case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden on the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.

144 F.3d 433, 438—39 (6th Cir.1998). Applying that equitable authority, the *Swinney* court said "it will only invoke its equitable powers under § 105(a), so as to partially discharge a student loan debt, if it finds that the equities of the situation tip distinctly in favor of the debtor. This principal is based on the simple legal maxim that one who seeks equity must also do equity." 266 B.R. at 806 (citations omitted). In the end, the *Swinney* court declined to grant the debtor a partial discharge because she had failed to apply to the federal income contingent repayment program before seeking to discharge the debt in bankruptcy. The *Swinney* court explained that program in detail:

> a borrower may qualify for an Income Contingent Repayment Plan, where the amount of the required monthly payment is recalculated yearly based on the borrower's Adjusted Gross Income, family size and the "poverty guidelines" pro-

mulgated by the United States Department of Health and Human Services. The repayment period covers a maximum of 300 months. The amount of payments are dependent on the borrower's income and payment may not be required at all during times when the borrower has little income. The balanced remaining after the 300–month period is deemed forgiven.

*England v. United States of America (In re England)*, 264 B.R. 38, 44 (Bankr.D.Idaho 2001).

Regarding the issue of invoking equitable powers to partially discharge a student loan obligation, a court in this jurisdiction has previously ruled it did not possess the authority to grant a partial discharge of a study loan. *Skaggs*, 196 B.R. at 866—67. In that case, Judge Bohanon stated that "section 523(a)(8)(B) itself limits a court's power to act only on the entire student loan obligation." *Id.* at 866. Because of other issues, we need not venture that far in this order.

█ Reviewing the facts in this case to see if they meet the three prongs of the *Brunner* test, this Court concludes:

(1) the debtor cannot maintain, based on her current income and expenses, a minimal standard of living for herself if forced to repay the loans at this time. She can, however, maintain her present minimal standard of living if the student loan debt payments are deferred.

(2) the debtor has not shown that additional circumstances exist indicating that the state of her financial affairs is likely to persist for a *significant portion* of the repayment period (thirty years). Although she has not found a position with a law firm, she admitted she is now busy in her private practice (she testified she works 40 hours a week) and will likely earn more money this year than in any of the past five years. Admittedly, $20,000 a year in gross income is most certainly on the lower end of the income scale for an attorney. But the court cannot glean from any of the evidence from the record presented that that low level of income is likely to continue for a *significant period* of the thirty-year loan repayment period.

█ (3) the debtor has made a good faith effort to repay the loans, but has failed to take advantage of available loan programs and future available deferments. She has made between ten and fifteen payments since she was graduated in 1999, and has utilized deferrals for the remainder of the repayment period that has elapsed. However she still has 36 months of deferrals available to her. The Court finds that her failure to use the remaining 36 months of deferrals while building her private practice, coupled with her failure to apply for the Income Contingent Repayment Plan or the William D. Ford Program, does not rise to the level of good faith required by the test set forth in *Brunner*.

## DECISION

For the reasons cited above the Court concludes it cannot and should not discharge Debtor's student loan debt, either partially or in its entirety.