### In re Troy L. ENGLAND and Shauna M. England, Debtors.

### Troy L. England and Shauna M. England, husband and wife, Plaintiffs,

v.

### United States of America; Direct Loans, U.S. Department of Education, Defendants.

Bankruptcy No. 00–01338.
Adversary No. 00–6321.

United States Bankruptcy Court,
D. Idaho.

July 3, 2001.

---

Jon R. Wilson, Boise, Idaho, for plaintiffs.

Warren R. Derbidge, Assistant U.S. Attorney, Boise, Idaho, for defendants.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background.

Debtors Troy and Shauna England (collectively "Plaintiffs") filed for relief under Chapter 7 of the Bankruptcy Code on May 26, 2000. Plaintiffs commenced this adversary proceeding against the United States of America Department of Education ("Defendant") on September 1, 2000, seeking a declaration that their obligation to repay Mr. England's student loans should be discharged pursuant to 11 U.S.C. § 523(a)(8).[1] A trial was conducted on May 3, 2001, at which the parties submitted evidence and testimony. At the conclusion of the trial, the Court allowed Plaintiffs to supplement the record to explain any interest Mrs. England holds in a Morgan Stanley investment. Plaintiffs filed the additional information on June 2, 2001. Docket No. 16. While Defendant was given an opportunity to respond to this information, or to seek further discovery concerning this account, no response nor request for further discovery was made. The issues thus raised were taken under advisement.

This Memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.

### II. Facts.

Plaintiffs live in Wilder, Idaho. Mr. England is 31 years old; Mrs. England is 29. Plaintiffs have two small children, Cassandra and Erin. Mr. England incurred the student loans in question in 1989–1990 and in 1993–1994. The 1989 and 1990 loans were incurred before Mr. and Mrs. England were married. These loans originated in Nebraska, Kansas or Missouri, none of which are community property states. Docket No. 16. Mr. England completed a two year degree from Devry Institute of Technology in electronics in 1994. Mr. England testified

---

1. The Court notes that Mrs. England has reached a compromise with Defendant concerning her student loan obligations. Exhibit

8. To avoid confusion, the Court will refer to the student loan debts at issue here as Mr. England's student loans.

that he borrowed approximately $16,000, but his current student loan balance is $35,318.58. Exhibit 12. Mr. England's loans have been consolidated.

Mr. England works for Precon Technologies as a service manager, repair technician and office manager in Boise. Precon Technologies repairs fax machines, computer printers and copy machines and sells toner cartridges for printers. Beginning in early May, Mr. England's pay was reduced to $10.50 per hour, or $1,680 per month, due to a reduction in the company's business.[2] His monthly net pay, after withholdings is $1,491.74. Exhibit 19. Mrs. England is not currently employed. She has previously worked as a certified nursing assistant in Kansas, Nebraska and Missouri. Mrs. England could become certified in Idaho by presenting a current certificate from another state to the appropriate Idaho licensing authority. However, she is uncertain whether her Kansas, Nebraska or Missouri licenses are current.

In 1998 and 1999, Plaintiffs reported adjusted gross income of $25,117 and $32,005 respectively on their tax returns. Exhibits B and C. In 2000, Plaintiffs reported $26,641 in adjusted gross income, which included a capital gains distribution of $2,371. Exhibit 13. This capital gains distribution is from a Morgan Stanley account in the name of Mrs. England. The account consists of mutual funds and all dividends are automatically reinvested. It was established and is managed by Mrs. England's grandmother. Docket No. 16. Mrs. England testified during the trial and later by way of affidavit that she has never received any funds from this account. Docket No. 16. The value of this account as of March 31, 2001 was $9,356.44. Docket No. 16, Exhibit A. Prior to this trial

Mrs. England had never received any statements or documentation concerning this account, except for a 1099 form showing her 2000 capital gains distribution. Docket No. 16. While obviously Mrs. England's grandmother had a reason for placing these funds in an account under Mrs. England's name, there was no real proof from which the Court can discern whether Mrs. England can expect to access the funds.

Plaintiffs' Schedule J lists monthly expenses totaling $2,477. Exhibit 1. These expenses include $560 rent for Plaintiffs' mobile home and lot; $150 for electricity and heating fuel; $18 for water and sewer; $45 for telephone service; $20 for work-related internet service; $24 for garbage; $600 for food; $100 for clothing; $50 for laundry and dry cleaning; $300 for medical and dental expenses; $250 for transportation; $125 for recreation; $25 for renter's insurance; $75 for auto insurance; $100 for diapers and baby items and $35 for personal hygiene. Additionally, Plaintiffs submitted Exhibit 4 at trial, which is a chart showing Plaintiffs' actual expenses broken down into similar categories of expenses as shown on their Schedule J from September 1, 1998 to February 15, 2001, and Exhibit 15, which shows Plaintiffs' actual expenses from February 1, 2001 to April 29, 2001. Exhibits 4 and 15 will be discussed in greater detail below.

Mr. England suffered a work-related hand injury in February 1996. As a result of this injury, he lost part of the use of his right hand and has had difficulty finding work in the electronics field in which he was trained. He received a lump sum worker's compensation settlement of $10,581.05. Exhibit 5. From the settle-

---

**2.** Mr. England testified that his highest pay rate with his current employer was $13 per hour.

ment, Mr. England received approximately $7,500 after payment of attorney's fees. This injury does not hinder Mr. England in his current employment.

Mr. England and Cassandra England suffer from familial hypokalemic periodic paralysis. Exhibits 6 and 7. This is a permanent and unpredictable genetic disorder which requires Mr. England to carefully regulate the amount of potassium he ingests. If he consumes too much or too little potassium, he may suffer episodes of muscle weakness, muscle paralysis, or possibly even death. Mr. England must monitor his sodium level as well.

Although Mr. England's health has been good recently, in the past he has suffered episodes requiring hospitalization, and he may suffer a similar incident at any time. Any paralysis would require hospitalization and possibly follow-up visits to physicians. Mr. England takes two medications to treat this disorder and an antidepressant to counteract the side effects of those medications. Exhibit 6. Plaintiffs have no private medical insurance.

Cassandra England has also been diagnosed with familial hypokalemic paralysis but does not currently require medication. She will, though, when she becomes an adolescent. Exhibit 7. Cassandra is covered by Medicaid and the Idaho Children's Health Insurance Program. Plaintiffs' baby is yet too young to be diagnosed, but there is a substantial chance that the baby will also be afflicted with this condition.

According to the evidence, there are at least four options available to Plaintiffs to repay Mr. England's student loans. Exhibit 11. Under the Standard Repayment Plan, Plaintiffs would pay $433.18 per month for 120 months[3]. Under the Extended Repayment Plan, Plaintiffs would pay $300.93 per month for 240 months. The third option is the Graduated Repayment Plan, under which a borrower makes monthly payments that increase every two years over a 240–month period. Plaintiffs' payment would start at $242.81 per month under this plan. Finally, a borrower may qualify for an Income Contingent Repayment Plan, where the amount of the required monthly payment is recalculated yearly based on the borrower's Adjusted Gross Income, family size and the "poverty guidelines" promulgated by the United States Department of Health and Human Services. The repayment period covers a maximum of 300 months. The amount of payments are dependent on the borrower's income and payment may not be required at all during times when the borrower has little income. The balance remaining after the 300–month period is deemed forgiven. Under this program, Plaintiffs would currently be required to pay $165.68 per month.

**3.** Plaintiffs' Exhibit 11 is a pamphlet describing the repayment options available under the Federal Direct Loan Program. Although a chart showing examples of monthly payments under each repayment plan is included in this exhibit, the evidence is silent as to Plaintiffs' actual monthly payment under these repayment options. While obviously outside the record, an interactive repayment calculator is made available to the public on the Internet through the Department of Education's website at http://www.ed.gov/DirectLoan/Repay-Calc/dlentry2.html. The Court is confident the information provided on this site is reliable.

To use the payment calculator, the Court inserted Mr. England's student loan balance, Plaintiffs' 2000 adjusted gross income of $26,641 and assumed a maximum interest rate of 8.25 percent to compute the monthly payment under each repayment option. The Court notes that as of the date of this decision, the website indicates the current interest rate on student loans is 8.19 percent. Because interest rates on student loans are subject to change, the Court believes it is necessary, for purposes of this analysis, to use the maximum interest rate.

## III. Discussion.

As provided by 11 U.S.C. § 523(a)(8), a discharge under Section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt incurred:

for an educational benefit, overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents. . . .

■■■ In interpreting whether excepting a student loan from discharge under Section 523(a)(8) imposes an undue hardship on the debtor, the Ninth Circuit has adopted the so-called *Brunner* test. *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir.1998). *Brunner* established a three prong analysis to determine whether repayment of student loans creates an undue hardship. Under the analysis, it must be shown that: (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans. *Brunner v. New York Higher Ed. Servs. Corp. (In re Brunner)*, 46 B.R. 752, 756 (S.D.N.Y.1985), *aff'd* 831 F.2d 395, 396 (2d Cir.1987). The debtor bears the burden of proof on all three elements. *Pena*, 155 F.3d at 1111; *Ritchie v. Northwest Educ. Loan Assn. (In re Ritchie)*, 254 B.R. 913, 917 (Bankr.D.Idaho 2000).

### A. Brunner Analysis.

#### 1. Minimal Standard of Living.

■■■ A minimal standard of living requires more than a showing of tight finances. *Weil v. U.S. Bank (In re Weil)*, 00.2 I.B.C.R. 110, 111 (Bankr.D.Idaho 2000) (quoting *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 314 (Bankr.W.D.Wis.1999)). Debtors are expected to live within the strictures of a frugal budget in the foreseeable future. *Weil*, 00.2 I.B.C.R. at 111 (quoting *Healey v. Massachusetts Higher Education (In re Healey)*, 161 B.R. 389 393 (Bankr.D.Mich. 1993)). In deciding whether Plaintiffs can maintain a minimal standard of living if required to repay the student loans, the Court looks to the Plaintiffs' monthly income and expenses. *Pena*, 155 F.3d at 1112; *Weil*, 00.2 I.B.C.R. at 111.

As stated above Mr. England earns $10.50 per hour. Mr. England testified that he had agreed to a reduction in pay so that he would not be laid off. His monthly net pay is $1,491.74. Mrs. England is currently unemployed. Mrs. England's testimony that she has not received any funds from the Morgan Stanley account and does not have access to the account is uncontradicted. For the purposes of this proceeding the Court concludes that Plaintiffs' monthly income is $1,491.74.

As stated above, Plaintiffs' Schedule J shows expenses of $2,477 per month. Additionally, under the compromise reached with Educational Credit Management Corporation, Plaintiffs will pay $50 per month to satisfy Mrs. England's student loans. Exhibit 8. This amount will be included in their budget. Both Mr. and Mrs. England testified that their Schedule J fairly represents their current monthly expenses. However, the Court concludes several

items of Plaintiffs' budget appear excessive and merit discussion.[4]

First, Plaintiffs' housing expense for their Wilder home is $560 per month. Plaintiffs rent a three-bedroom mobile home from Mrs. England's parents for $450 per month and pay lot rent of $110 per month, also to Mrs. England's parents. While arguably Plaintiffs should live in Boise near Mr. England's job, the Wilder arrangement has been beneficial to Plaintiffs. They have been allowed to make partial payments to cover the rent rather paying the rent in one lump sum.[5] This arrangement appears to make financial sense as well. From the Court's experience with debtors residing in Boise, comparable living arrangements in the city would likely exceed the $560 Plaintiffs currently pay. Plaintiffs' $560 per month housing expense is not excessive.

As stated above, Plaintiffs' Schedule J shows they pay $150 for electricity and heating fuel. Plaintiffs paid $210.54 for natural gas on August 10, 1999. Exhibit 4. This appears to be the only expense for heating fuel Plaintiffs have incurred in the recent past. Exhibit 15 also shows electricity expenses of $117 and $63 in February and March of 2001.[6] The Court concludes Plaintiffs' electricity expense, as listed in their Schedule J, exceeds what is necessary to maintain a minimal standard of living. Based upon Plaintiffs' actual electricity expenses and this Court's experience in determining minimal standard of living in actions under Section 523(a)(8), it appears that an electricity expense of $100 per month is sufficient to enable Plaintiffs to sustain a minimal standard of living.

Schedule J shows transportation expenses of $250 per month. For each of the last four months Plaintiffs' automobile expense has been less, and sometimes significantly less, than $250 per month. Plaintiffs' actual automobile expenses including gasoline, license fees, maintenance and one traffic ticket were $196.62, $94.50, $245.90 and $124.01 for January, February, March and April of 2001.[7] Again, compared to the evidence, the transportation expense listed in Plaintiffs' Schedule J exceeds their actual monthly transportation expenses during 2001. While the Court recognizes Mr. England commutes from Wilder to Boise each day, the amount they suggest is needed for transportation exceeds what is necessary for Plaintiffs to sustain a minimal standard of living. A transportation expense of $200 per month is more in line with a minimal standard of

---

4. In order to consider Plaintiffs' current monthly expenses, as required by *Brunner*, the Court will look to Plaintiffs' actual expenses incurred in January 2001 in Exhibit 4 and the expenses incurred in February through April as shown in Exhibit 15 in determining whether Plaintiffs are able to maintain a minimal standard of living.

5. Mrs. England's testimony, that Plaintiffs make partial payments for their rent, is uncontradicted. The Court simply notes that no check or charge for $450 or $110 appears in Plaintiffs' bank statements (Exhibits 3, 16 and 17) or in Exhibits 4 or 15. Exhibit 4 does show rent payments totaling $545 in January of 2001. Additionally, Plaintiffs' Exhibit 15 shows a $500 payment for "Rent & Electric" in April of 2001.

6. No electricity expense appears in Exhibit 4. Exhibit 15 lists a $500 "Rent & Electric" expense for April 2001, but the Court has already discussed this particular expense in considering Plaintiffs' housing expense.

7. Plaintiffs appear to have taken a vacation in March, the cost of which is reflected in their March transportation expense. Exhibit 17 shows ATM card purchases for gasoline in Rufus Oregon, Wood Village Oregon and La Grande Oregon totaling $79.28. The April automobile expense includes a $53 traffic ticket.

living based on Plaintiffs' actual transportation expenses.

■ Plaintiffs' budget includes $125 per month for recreation. From January through April, Plaintiffs spent $122.64, $100, $686.47[8], and $147.87 on recreation expenses. Exhibits 4 and 15. Plaintiffs' spending on recreation appears excessive under their circumstances. Even with two young children, a recreation budget of $125 per month exceeds what is necessary for Plaintiffs to maintain a minimal standard of living. Under the evidence, $50 per month for recreation and entertainment is adequate to allow Plaintiffs to maintain a minimal standard of living.

■ Plaintiffs also list $300 per month for medical and dental expenses. As Mrs. England testified, Plaintiffs' medical bills are what motivated them to seek relief in bankruptcy, and these debts have now been discharged. Plaintiffs' actual medical expenses are difficult to understand. It appears that Mr. England's prescriptions cost approximately $60 per month.[9] Exhibits 4 and 15. The only other medical expenses the Court could discover from the proof was in January for $10.14 in prescription medications. Exhibit 4. Plaintiffs did not document any medical expenses in February. In March, Plaintiffs spent $885.30 on eyecare, hospital bills, physician bills and prescriptions.[10] In April Plaintiffs spent $17.87 on prescriptions. From this information, the Court concludes Plaintiffs' medical and dental ex-

penses as projected in their Schedule J exceed what is necessary for them to maintain a minimal standard of living in light of their Chapter 7 discharge. A medical expense of $200 per month is sufficient to ensure that Plaintiffs maintain a minimal standard of living.

■ The Court finds a monthly budget of $2,252 would be adequate to allow Plaintiffs to maintain a minimal standard of living. Of course, even with the Court's revisions to Plaintiffs' budget, their expenses exceed their current income by approximately $761 per month. In other words, without making any student loan payment at all, Plaintiffs are not currently able to maintain a minimal standard of living based on their current income and expenses. The Court concludes that Plaintiffs have satisfied the first prong of the Brunner analysis.

### 2. Additional Circumstances.

■ *Brunner* requires Plaintiffs to show the existence of additional circumstances indicating they will likely be unable to maintain a minimal standard of living if compelled to repay their student loans over a significant portion of the repayment period. One relevant factor in this examination is the possibility that Plaintiffs' financial condition could improve in the future. Mr. England admits he is earning significantly less than the market rate at his current job given his skills and experience in the computer and electronics

8. This amount includes $362.30 for an expense labeled as "computers," $131.50 for a bowling ball which was a birthday present for Mr. England, $168.99 for toys and games for the England children and video rentals of $23.68.

9. Exhibit 4 shows two charges of $59.58 in January, and Exhibit 15 shows a $59.95 prescription expense in March. Mr. England qualifies for a low income subsidy for his

medication. It is not known whether the $60 monthly cost takes this subsidy into account or not.

10. Mr. England testified that Plaintiffs forgot to schedule several medical bills in their bankruptcy case. It is not clear from the record whether the hospital and physician bills here, which total $603.95, were among these debts or not.

field and previous pay rates. As stated above, he agreed to a reduction in pay to avoid being laid off. Mr. England testified that the going rate for his type of employment is $13 per hour in the Boise area, and he is seeking a different job with a higher pay rate. Obtaining employment in line with the going rate of pay would increase Plaintiffs' gross income by approximately $400 per month.

On the other hand, Mr. England's medical condition weighs against a finding that Plaintiffs' financial condition is likely to improve. Mr. England could suffer an episode of hypokalemic paralysis at anytime. Even a minor episode may result in him missing work, while a more serious event may lead to significant medical bills, hospitalization and visits with physicians. Furthermore, Cassandra England also suffers from this condition, and were she to suffer an episode, more medical bills could be expected. Also, sometime during her adolescence, Cassandra will need prescription drugs to regulate the potassium levels in her body as well. Exhibit 7.

All things considered, even with Mr. England's likely increase in future income, Plaintiffs' expenses could still exceed their income by a considerable sum. There is also some likelihood that Plaintiffs will incur additional medical costs in the future because of Mr. England's and Cassandra's condition and their need for prescription medications. Plaintiffs would have to bear the cost of any medical expenses not covered by Medicaid or the Idaho Children's Health Insurance Plan because they do not have private health insurance.[11]

The Court concludes that Plaintiffs' have satisfied the second prong of *Brunner* as well.

### 3. Good Faith.

### a. Plaintiffs' Efforts to Repay Loans.

*Brunner* requires Plaintiffs' to show they have made a good faith effort to repay their student loans. *Brunner*, 46 B.R. at 755. "With the receipt of a government guaranteed education, the student assumes an obligation to make a good faith effort to repay these loans, as measured by his or her efforts to obtain employment, maximize income and minimize expenses." *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993). But, "failure to make even minimal payments on student loans does not prevent a finding of good faith where the debtor never had the resources to make payments." *Brown v. Salliemae Servicing Corp. (In re Brown)*, 227 B.R. 540, 546 (Bankr.S.D.Cal.1998), *aff'd in part, rev'd in part*, 239 B.R. 204 (S.D.Cal.1999).

Mr. England testified Plaintiffs have constantly struggled to make ends meet during the course of their marriage; this is the second bankruptcy case he has filed. Plaintiffs' efforts to make payments on their student loans have been sporadic at best. Over the years, Plaintiffs have made small payments on Mr. England's student loans when they were able to do so and have requested forbearances on both their student loans to avoid default. However, the record does not reflect Plaintiffs have ever attempted to restructure their student loans through any of the repayment plans made available to borrowers by the Department of Education. Due to Plaintiffs' lack of payment, accrued interest has more than doubled the balance due on these loans.

---

11. In their case, the cost of obtaining private health insurance is more than Plaintiffs can afford, and would be of limited benefit because Plaintiffs would be required to pay a significant deductible and a portion of out of pocket expenses for any hospitalization. Exhibit 18.

Defendant points to the worker's compensation settlement Mr. England received in 1996 as evidence that Plaintiffs have had the means to make some payment on their student loans at times, but have failed to do so. Mr. England testified that the settlement proceeds were used to pay overdue bills and living expenses incurred while he was out of work due to the injury. No amount was paid on Mr. England's student loans.

It also appears Plaintiffs may have had the ability to make payment on their student loans at another time, but failed to do so. Plaintiffs received federal and state tax refunds for their 2000 taxes totaling more than $3,500. Exhibits 15, 16. Mr. England testified this money was spent on doctor's bills Plaintiffs failed to schedule in their bankruptcy, overdue bills, and items for their new baby. The record bears out these expenses, and many others, such as $532.24 for clothing, $296.22 for dining out, $338.48 for household furnishings, $238.45 for unassigned household expenses, $362.30 for "computers," $131.50 for a bowling ball, $168.99 for toys and games and $245.92 for lodging while on vacation. Exhibit 15.

### b. Mrs. England's Lack of Employment.

Some of Mr. England's loans were incurred prior to Plaintiffs' marriage. All the loans were made while Plaintiffs were living in non-community property states. Mrs. England signed none of the promissory notes or other contracts for these loans. Because of this, Plaintiffs assert Mrs. England's potential income should not be considered as part of the undue hardship analysis. Plaintiffs submitted no authority to support this position, and the Court was unable to locate cases endorsing this notion through its own research. Rather, the case law seems to suggest the opposite approach is required.

■ For example, in *Ipsen v. Higher Educ. Assistance Found. (In re Ipsen)*, 149 B.R. 583 (Bankr.W.D.Mo.1992), the debtor and her husband were married after debtor incurred the student loans and filed for bankruptcy. The court held the husband's income must be included in the undue hardship analysis. *Id.* at 585. *See also Dolan v. American Student Assistance (In re Dolan)*, 256 B.R. 230, 236 (Bankr.D.Mass.2000) (holding non-debtor spouse's income and assets must be included in undue hardship analysis); *Elmore v. Massachusetts Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 27 (Bankr.D.Conn.1999) (holding non-plaintiff spouse's income must be included in undue hardship analysis). In the absence of contrary authority, the Court concludes it proper to consider Mrs. England's potential income in making the undue hardship analysis required by Section 523(a)(8).

Mrs. England is not currently employed, nor is she seeking employment. She testified that in order to obtain an Idaho license as a certified nursing assistant, her chosen field, she must present a current license from another state to the Idaho authorities. Mrs. England testified certified nursing assistants in the Boise area earn about $7.50 per hour. At trial, she was not sure whether her licenses from Kansas or Missouri were still current.[12] If Mrs. England has no current out-of-state license, she would have to satisfy the

---

12. The Court notes that Mrs. England testified that she had worked in a nursing home in Wilder during the spring and summer of 1999 prior to the birth of Plaintiffs' second child, but it is not clear that she worked as a certified nursing assistant. Exhibit 4. Mrs. England's testimony that her previous licenses may have lapsed is uncontradicted and she apparently has no Idaho license.

state's licensing requirements, which Plaintiffs may not be able to afford. However, even if Mrs. England could be certified in Idaho, she indicated the earliest she would choose to return to work was when Erin started school, approximately five years hence, because she distrusts the private day care system. Mrs. England is in good health and there is no apparent problem with her obtaining employment of some type, whether as a nursing assistant or otherwise.

The Court is not impressed by Mrs. England's failure to expend the effort to determine if she could be licensed in Idaho. The Court also feels that, under the circumstances, Mrs. England's steadfast refusal to consider employment outside the home until her youngest child reaches school age based upon general suspicions about available child care is ill-considered. Previously, this Court has held that a debtor's lack of full employment could serve as the basis for the Court's conclusion that a debtor had failed to satisfy the good faith prong of the *Brunner* analysis. *Weil,* 00.2 I.B.C.R. at 113 (holding debtor failed to satisfy good faith requirement due to thirteen years of sporadic employment); *Bryant v. Wells Fargo Bank (In re Bryant),* 99.3 I.B.C.R. 118, 119–20 (Bankr.D.Idaho 1999) (holding debtors, who were teachers, failed to show good faith where they did not seek employment during the summer months).

c. **Plaintiffs Have Failed to Establish Good Faith.**

 A debtor's efforts to deal with unpaid students loans is critical to showing good faith. Although Plaintiffs have struggled financially since their marriage, they have made no serious efforts to make payment on Mr. England's student loans. While they were granted a number of forbearances, some of these debts are more

than ten years old. In addition, Plaintiffs have not explored alternative repayment programs, such as the Income Contingent Payment Plan that would allow them to repay the loans at a rate adjusted for their income and family size. The accrued interest has more than doubled the balance owed on these debts. Plaintiffs received a large worker's compensation settlement, but failed to use any part of it to repay student loans. After receiving a recent tax refund, Plaintiffs spent over $2,300 on items such as dining out, home furnishings, a new computer and vacationing. In addition, Mrs. England is not employed, nor is she currently seeking employment.

Under these circumstances, the Court holds Plaintiffs have failed to show they have made a good faith effort to repay the student loans at issue here. Accordingly, the Court must conclude Plaintiffs have failed prove they are entitled to a discharge of the student loans at issue here on the basis of undue hardship.

B. **Partial Discharge.**

 This Court has previously discussed the uncertainty surrounding the bankruptcy court's authority to declare a "partial discharge" of student loan debt under the conflicting case law within this circuit. *Ritchie,* 254 B.R. at 923 (citing *United Student Aid Funds, Inc. v. Taylor (In re Taylor),* 223 B.R. 747, 753 (9th Cir. BAP 1998) and *Great Lakes Higher Educ. Corp. v. Brown (In re Brown),* 239 B.R. 204, 212 (S.D.Cal.1999)). Under a recent decision by the Ninth Circuit Court of Appeals, however, that uncertainty seems greatly diminished. In *Graves v. Myrvang (In re Myrvang),* 232 F.3d 1116 (9th Cir.2000), the Court upheld the bankruptcy court's order granting a partial discharge of debts arising from a divorce under Section 523(a)(15). While *Myrvang* was not a student loan case, the language

of Sections 523(a)(8) and 523(a)(15) are very similar. Moreover, in reasoning that the bankruptcy court could exercise discretion in discharging some, but not all, of the disputed debt, the Court of Appeals relied heavily upon the analysis found in *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir. 1998), a case which validated a partial discharge of student loan debt under the bankruptcy court's equitable powers granted by Section 105(a). *Myrvang*, 232 F.3d at 1123–24. In other words, while the Ninth Circuit has not yet interpreted the Code to allow bankruptcy courts authority to grant a partial discharge of student loan debts, given *Myrvang*, this Court is confident the Court of Appeals would endorse such an approach under appropriate facts.

■■■ While the Court may have the authority to partially discharge a student loan debt, the Court should cautiously approach the subject of when in the exercise of its discretion it *should* do so. Section 105(a) provides in part that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." As explained by the Sixth Circuit, Section 105(a) empowers a bankruptcy court to enter a partial discharge of a student loan debt where undue hardship does not exist, but where the facts and circumstances require intervention by the court given the debtor's heavy financial burden. *Hornsby,*

144 F.3d at 439. *Hornsby* discusses a number of equitable techniques a court can utilize to effect a partial discharge, including discharging an arbitrary amount of the principal; accrued interest or attorneys fees; institution of a repayment schedule (presumably modifying the agreed or otherwise available repayment terms of the loan); deferring repayment; allowing the debtor to reopen the discharge proceedings at a later date to revisit the propriety of a hardship discharge; and fashioning any appropriate remedy. *Id.* at 440.[13]

■■■ The Court's utilization of its equitable powers under Section 105(a) is discretionary and must be carefully applied in light of the facts of the case, applicable precedent, and appropriate policy. *Fraley v. United States Dept. of Educ. (In re Fraley)*, 247 B.R. 417, 422 (Bankr. N.D.Ohio 2000). *See also Missoula Fed. Credit Union v. Reinertson (In re Reinertson)*, 241 B.R. 451, 454 (9th Cir. BAP 1999) (reviewing bankruptcy court's exercise of equitable powers under Section 105(a) for abuse of discretion), *Kapinos v. Graduate Loan Ctr. (In re Kapinos)*, 243 B.R. 271, 277 (W.D.Va.2000) ("If the bankruptcy court finds that the *Brunner* standard has been met, it may, in exercise of its equitable power, discharge all of [debtors'] loans or only a portion of them. Likewise, the bankruptcy court may exercise its equitable power under § 105 to discharge a portion of [debtors'] student loans even if it

---

13. Another approach was taken by *Greenwalt v. Greenwalt (In re Greenwalt)*, 200 B.R. 909, 913–14 (Bankr.W.D.Wash.1996) where the bankruptcy court concluded that the aggregate debt owed to a former spouse should be divided into its separate obligations. The court could then discharge a number of the separate obligations, which would result in total discharge of *that particular obligation*, but only a partial discharge of the total debt. It appears the Ninth Circuit disfavors this approach because it "might yield inequitable results, as when one party's total debt ... is composed of a very large obligation plus a much smaller one. In that case, if the debtor requested discharge and had an ability to pay an amount that was slightly less than the large obligation but much more than the small obligation ... the bankruptcy court would have to discharge the large obligation in its entirety." *Myrvang*, 232 F.3d at 1123. In any event, Mr. England's student loans have been consolidated, rendering the partial discharge approach adopted in *Greenwalt* inapplicable.

finds that the *Brunner* standard has not been satisfied.").

■■■ Use of a partial discharge should be reserved for appropriate circumstances. Merely establishing that the debtor will benefit from a partial discharge of a student loan debt is insufficient to warrant application of Section 105(a) because presumably all debtors would benefit to some extent from a partial discharge of their student loans. *Id.* Rather a bankruptcy court should only invoke its equitable powers under Section 105(a) to partially discharge a student loan if it finds that the equities of the situation weigh distinctly in favor of the debtor. *Id.*

■■■ After consideration of the facts and circumstances of this case, the Court concludes the equities here do distinctly favor the debtor and warrant exercise of the Court's equitable powers under Section 105(a). In this case, the Court is particularly concerned about Mr. England and Cassandra's medical condition combined with Plaintiffs' lack of medical insurance coverage. As the evidence shows, Mr. England can be struck with episodes of varying severity with little real warning. Financial planning in light of this potential is a challenge.

Additionally, Plaintiffs would likely struggle to make payments even under the Income Contingent Repayment Plan if Mr. England did not receive some relief from the amount due on his debts. At times, Plaintiffs will have some amounts available to them to pay on their loans. At others, they will be stressed just to meet their basic financial needs.

In light of the exceptional facts of this case, the Court concludes it should grant some relief to Plaintiffs by declaring all accrued interest and other charges that have accrued on Mr. England's loans discharged. However, the principal amount due on the loans shall not necessarily be discharged. Mr. England testified the original amount of his student loan obligations was approximately $16,000. Plaintiffs should make arrangements to repay as much as they can on the principal balance under one of the available Department of Education programs, most likely the Income Contingent Repayment Plan. In this fashion, they can either pay, or be relieved of the obligation to pay, the loan balance. In addition, should Mr. England or Plaintiffs' child suffer additional severe episodes of ill-health, the Court may, upon request, be inclined to revisit its decision.

## V. Conclusion.

Plaintiffs failed to establish repayment of their student loans constitutes an undue hardship under the *Brunner* test. This is so because, while Plaintiffs do not have the necessary income to maintain a minimal standard of living, and while their predicament is likely to continue into the future, they could not show they made good faith attempts to pay their student loan debts. In addition, Mr. England needs to secure a job paying him market rate wages and Mrs. England needs to rethink her refusal to secure employment outside the home.

However, in spite of Plaintiffs' failure to demonstrate good faith, their circumstances compel the Court to consider some sort of relief. While unclear in the past, recent case law from the Ninth Circuit persuades the Court that, given the equities of this case, under authority of Section 105(a) it should grant Plaintiffs a partial discharge of the accrued interest and other charges due on the student loan debts. Hopefully, Plaintiffs and Defendant can make arrangements allowing Plaintiffs to pay the principal balance due on the loans under existing repayment plans, which amounts shall be excepted from discharge, barring future medical problems.

The parties shall promptly agree upon a form of judgment to be submitted to and entered by the Court.