**EDUCATIONAL CREDIT
MANAGEMENT CORPORATION,
Appellant,**

v.

**Michael Thomas RHODES, Appellee.**

**No. C11–0194–JCC.**

United States District Court,
W.D. Washington,
at Seattle.

Jan. 24, 2012.

Michaelanne Ehrenberg, Seattle, WA, for Appellant.

## ORDER

JOHN C. COUGHENOUR, District Judge.

Educational Credit Management Corporation (ECMC) appeals the order of the U.S. Bankruptcy Court for the Western District of Washington discharging a substantial portion of Michael Thomas Rhodes's student debt. Having thoroughly considered the parties' briefing and the relevant record, the Court reverses the decision of the Bankruptcy Court for the reasons explained herein.

## I. BACKGROUND

According to stipulated facts from the proceedings before the Bankruptcy Court, Mr. Rhodes is a single, 52–year–old man with no dependents. (Bankruptcy Record, Case No. 10–01345–MLB ("BR"), Dkt. No. 19 at 2.) He was awarded an Associate's Degree in Art Education in 1983, but he later resumed his education, obtaining a Bachelor's Degree in Bio–Agricultural Science from Colorado State University in 1991. (*Id.* at 3.) He then proceeded to earn a Master's Degree in Library and Information Science from Drexel University in 1995 and a Certificate in Network Systems Administration from Denver Technical College in 2000. (*Id.*)

Mr. Rhodes financed much of his education through student loans, which origi-nally totaled $53,460. However, as a result of nonpayment and reconsolidation, his loan balance as of early 2011 had grown to $158,330.64. (*Id.* at 4.) During the Bankruptcy Court hearing, ECMC introduced evidence regarding the William D. Ford Direct Consolidation Program, which allows borrowers to make loan payments under an Income–Based Repayment Plan ("IBRP") of no more than 15 percent of the amount by which the borrower's adjusted gross income exceeds 150 percent of the poverty guidelines established under federal law. (*Id.* at 5; BR, Dkt. No. 33 at 119–20; *see also* 34 C.F.R. §§ 685.208(m), 685.221.) After 25 years, any remaining balance is forgiven. 34 C.F.R. § 685.221(f). According to ECMC, Mr. Rhodes's monthly payment under the IBRP would be $10.

From September 2003 to January 2006, Mr. Rhodes worked as the director of two separate college libraries, earning approximately $50,000 per year. (BR, Dkt. No. 33 at 28, 36.) Hoping to earn more, he left his position as library director to become an information technology ("IT") quality assurance tester, working under contract for Group Health Cooperative, Microsoft, and finally the Seattle Times. (*Id.* at 35–36, 38, 40.) In December 2007, he moved to Southern California and worked briefly in quality assurance for the Walt Disney Company. (*Id.* at 46.) Upon the termination of that employment, he applied for unemployment benefits. His job search at that time focused on "low stress" jobs outside the IT field, and he found employment through Craigslist as a caregiver. (*Id.* at 46–47.) As of early 2011, he had been unemployed for most of the previous two years, and he was no longer receiving unemployment compensation by October 2010. (BR, Dkt. No. 19 at 2.)

Mr. Rhodes stipulated that has not been diagnosed with any medical condition that

would prevent him from working or "otherwise being gainfully active." (BR, Dkt. No. 19 at 2.) During the hearing before the Bankruptcy Court, he confirmed that he had not been diagnosed "as such" with any condition that would affect his ability to work. (BR, Dkt. No. 33 at 41.) Although he testified to his belief that he has obsessive compulsive disorder, he stated that it has "diminished a lot" since his youth. (*Id.* at 43.)

Mr. Rhodes filed for bankruptcy protection under Chapter 13 of the bankruptcy code in July 2007, and a discharge was issued in January 2011. (BR, Dkt. No. 19 at 2.) He filed an adversary proceeding seeking discharge of his student loan debt in June 2010, claiming undue hardship under 11 U.S.C. § 523(a)(8). In January 2011, the Bankruptcy Court issued an oral decision on his claim for discharge, concluding that Mr. Rhodes met all of the requirements for showing undue hardship and discharging all but $35,000 of Mr. Rhodes's student debt. (BR, Dkt. No. 24.) ECMC timely appealed that decision and elected to have the appeal heard in this Court pursuant to 28 U.S.C. § 158(c)(1). In lieu of a response brief, Mr. Rhodes submitted a letter to the Court requesting that he be permitted to argue his case by phone. (Dkt. No. 13.)

## II. DISCUSSION

This Court reviews the Bankruptcy Court's findings of fact for clear error. *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1110 (9th Cir.1998). The application of law to those findings, including the ultimate question of whether student loan debt is dischargeable as an undue hardship, is reviewed de novo. *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1087 (9th Cir.2001).

Educational loans may be discharged in bankruptcy only if "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). To determine whether repayment of student loans will impose an "undue hardship" on the debtor, the Ninth Circuit has adopted the three-part test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir.1987). *See Pena*, 155 F.3d at 1112. That test requires the debtor to prove: (1) that he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and (3) that the debtor has made good faith efforts to repay the loans. *Pena*, 155 F.3d at 1111; *Brunner*, 831 F.2d at 396. Courts have emphasized that the language in 11 U.S.C. § 523(a)(8) evinces "clear congressional intent ... to make the discharge of student loans more difficult than that of other nonexcepted debt." *Brunner*, 831 F.2d at 396; *see also Rifino*, 245 F.3d at 1087 ("The existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans.") (quoting *In re Brunner*, 46 B.R. 752, 753 (Bankr.S.D.N.Y.1985)). The debtor bears the burden of proving each prong of the *Brunner* test by a preponderance of the evidence. *Rifino*, 245 F.3d at 1088. Failure to prove any of the prongs ends the inquiry and requires a finding of non-dischargeability. *Id.*

### A. Whether Appellee Can Maintain a Minimal Standard of Living if Forced to Repay His Loans.

To satisfy the first prong of the *Brunner* test, a debtor must prove more

than "temporary financial adversity" but need not prove "utter hopelessness." *In re Nascimento,* 241 B.R. 440, 445 (9th Cir. BAP 1999). A commonly cited standard questions whether it would be unconscionable to require the debtor to take steps to earn more or reduce expenses. *See In re Faish,* 72 F.3d 298, 307 (3d Cir.1995). Here, the Bankruptcy Court concluded that "based on an analysis of [Mr. Rhodes's] current lack of income, his most recent unemployment income, and his current expenses, he really is living in poverty and is living in very meager circumstances." (BR, Dkt. No. 34 at 13.) Based on that finding, the court determined that Mr. Rhodes had satisfied the first *Brunner* prong. ECMC argues that this conclusion was erroneous because (1) Mr. Rhodes has failed to maximize his income, and (2) he has continued to donate an unreasonable amount of money to charity. (Dkt. No. 12 at 20–21.)

■ The Court agrees with ECMC that the Bankruptcy Court erred in concluding that Mr. Rhodes had satisfied the first prong of the *Brunner* test. First, Mr. Rhodes's testimony at the bankruptcy hearing established that he is employable as a librarian or as an IT professional, but that he has focused his job search on home assistance work, which is markedly less lucrative. (BR, Dkt. No. 33 at 116–17.) Indeed, the Bankruptcy Court noted that Mr. Rhodes's "efforts to obtain work in most recent times have been largely, but not exclusively, looking for home assistance jobs." (BR, Dkt. No. 34 at 13.) But the court provided no basis for its inconsistent finding that Mr. Rhodes's circumstances were not "voluntarily created." (*Id.*) Nor did the court address the sufficiency of Mr. Rhodes's proffered reason for seeking home assistance work rather than IT work: that IT jobs were too stressful. (*See* BR, Dkt. No. 33 at 46.) While some jobs are more desirable than others, "a debtor cannot purposely choose to live a lifestyle that prevents her from repaying her student loans." *In re Nys,* 446 F.3d 938, 946 (9th Cir.2006). The testimony from the bankruptcy hearing— and the parties' stipulation that Mr. Rhodes has no medical condition preventing him from working—leads to the unavoidable conclusion that Mr. Rhodes has elected not to maximize his income.

The Bankruptcy Court also erred in finding that Mr. Rhodes had minimized his expenses notwithstanding his significant contributions to the Movement of Spiritual Inner Awareness ("MSIA"). (See BR, Dkt. No. 34 at 13.) Mr. Rhodes's testimony and the documentation from his Chapter 13 proceeding establish that between 2004 and 2010, he gave over $35,000 to MSIA. (BR, Dkt. No. 33 at 11.) In 2010, his Chapter 13 payments to MSIA averaged $190 per month, while his student loan payments averaged $35 per month. At the hearing, Mr. Rhodes testified that he would not consider reducing his contributions to MSIA in order to make payments on his student loans. (BR, Dkt. No. 33 at 129.) The Bankruptcy Court addressed these contributions only obliquely in its analysis of the first *Brunner* prong, finding that Mr. Rhodes's circumstances would be meager "even if he weren't contributing anything presently to his church." (BR, Dkt. No. 34 at 13.)

Courts have come to differing conclusions as to whether charitable or religious donations should be considered necessary expenses for the purpose of evaluating "undue hardship." *See, e.g., In re Durrani,* 311 B.R. 496, 504 (Bankr.N.D.Ill.2004) (bankruptcy judge should not override a

debtor's commitment to tithing); *In re McLaney*, 314 B.R. 228, 237 (Bankr. M.D.Ala.2004) ("bona fide charitable giving" may be considered within the debtor's reasonably necessary expenses); *but see In re Ritchie*, 254 B.R. 913, 921 (Bankr.D.Idaho 2000) (interpreting legislative history of 11 U.S.C. § 523(a)(8) to exclude religious and charitable donations as a proper expense item in determining whether a debtor would be unduly burdened by not discharging student loan debt); *In re Fulbright*, 319 B.R. 650, 660 (Bankr.D.Mont.2005) (charitable donations are *per se* improper expenses in determining whether discharging student loan debt would result in undue hardship). In line with the *Ritchie* and *Fulbright* courts, this Court finds it noteworthy that Congress amended several sections of the bankruptcy code to protect charitable or religious contributions, but did not see fit to so amend 11 U.S.C. § 523(a)(8). *See* 11 U.S.C. §§ 544(b)(2), 548(a)(2), 548(d)(2)–(4). Congress also excepted charitable contributions from the calculation of disposable income for determining required payments to creditors under Chapter 13 plans. 11 U.S.C. § 1325(b)(2)(A). As noted above, however, it is well established that the standard for discharging student loan debt is more exacting than that for other nonexcepted debt. *See Brunner*, 831 F.2d at 396; *Rifino*, 245 F.3d at 1087. Thus, some expenses that might be allowed under § 1325 may be eliminated under § 523(a)(8) without "undue" hardship. *See Fulbright*, 319 B.R. at 658.

▪ Without concluding that all religious or charitable contributions are *per se* unreasonable under § 523(a)(8), this Court grants far less deference to such voluntary contributions than to a debtor's contract-based obligations to his creditors. Here,

the Bankruptcy Court erred in failing to examine the appropriateness of Mr. Rhodes's monthly contributions to MSIA in its prong-one analysis. Mr. Rhodes did not show that he had minimized his expenses, including his contributions to MSIA, particularly given uncontroverted evidence that under the IBRP, Mr. Rhodes's monthly payment would be approximately $10.

For these reasons, the Court concludes that Mr. Rhodes did not satisfy his burden under the first prong of *Brunner*, and therefore a finding of non-dischargeability is required. The Court nonetheless addresses the second and third prongs, as they involve salient issues from the bankruptcy hearing.

**B. Whether Additional Circumstances Exist Indicating That Appellee's State of Affairs is Likely to Persist.**

▪ In construing the second prong under *Brunner*, the Ninth Circuit requires that debtors "demonstrate insurmountable barriers to the debtors' financial recovery and ability to pay." *Nys*, 446 F.3d at 946. In evaluating whether such barriers exists, courts may refer to the following nonexclusive list of potential "additional circumstances":

(1) Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; (2) The debtor's obligations to care for dependents; (3) Lack of, or severely limited education; (4) Poor quality of education; (5) Lack of usable or marketable job skills; (6) Underemployment; (7) Maximized income potential in the chosen educational field, and no other more lucrative job skills; (8) Limited number of years remaining in

the debtor's work life to allow payment of the loan; (9) Age or other factors that prevent retraining or relocation as a means for payment of the loan; (10) Lack of assets, whether or not exempt, which could be used to pay the loan; (11) Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; (12) Lack of better financial options elsewhere.

*Id.* at 947. The Bankruptcy Court examined these factors and concluded that Mr. Rhodes had met his burden under prong two. Central to the court's conclusion was its finding as to Mr. Rhodes's mental health: "I found that in fact, although it's unclear exactly what his mental disorder would be, that he does suffer from an emotional or mental condition that doesn't prevent him from working but does affect his ability to work at the maximum." (BR, Dkt. No. 34 at 8.)

■■■ This finding was clearly erroneous. Mr. Rhodes stipulated that he "has not been diagnosed, by any doctor, as having a medical condition that prevents him from working and otherwise being gainfully active." (BR, Dkt. No. 19 at 2.) His own testimony reinforced that stipulation. (BR, Dkt. No. 33 at 117.) The record contains no medical evidence or testimony to the contrary. Indeed, the Bankruptcy Court acknowledged that "there isn't clear medical evidence to me of a mental or physical disease preventing ... his employment." (BR, Dkt. No. 34 at 14.) Given that the record is unambiguous on this issue, the Bankruptcy Court's finding that Mr. Rhodes suffers from an unidentified mental condition is unsupportable. Even accepting the Bankruptcy Court's findings, Mr. Rhodes's purported mental disability

would not be serious enough to meet the standard set forth in *Nys*. The Bankruptcy Court explicitly found that the condition "doesn't prevent him from working" and that treatment Mr. Rhodes had received in the past "had some good effect on him, making him more able to sustain employment." (BR, Dkt. No. 34 at 8, 14.)

Of the remaining *Nys* factors, the Bankruptcy Court found that all but three were either positive or neutral: Mr. Rhodes's underemployment, his lack of assets, and his potentially increasing expenses. (*Id.* at 16, 18–19.) But the court attributed Mr. Rhodes's underemployment to his unspecified mental or emotional condition, and it also found that Mr. Rhodes's situation "can improve" and that he "is employable." (*Id.* at 20.) Given that the Bankruptcy Court's finding as to Mr. Rhodes's mental status was erroneous, the court had an insufficient basis for concluding that he had met his burden as to prong two.

### C. Whether Appellee Has Made Good Faith Efforts to Repay His Loans.

■■■ Whether a debtor has made good faith attempts to repay his loans can depend on various factors, including the debtor's efforts to maximize his income and minimize expenses. *In re Mason*, 464 F.3d 878, 884 (9th Cir.2006). The Ninth Circuit has also held that a debtor's failure to negotiate a repayment plan is evidence the debtor has not met the burden of establishing good faith. *Id.* at 884–85.

■■ Here again, the Bankruptcy Court predicated its conclusion that Mr. Rhodes had made good faith efforts to repay his loans in part on its finding as to his mental health. The court dismissed the fact that Mr. Rhodes had quit jobs voluntarily, stating that "you'd have to conclude that the

voluntary terminations were based on his inability to handle the stress and work environment of the situations, which I think is in part, at least, affected by his mental or emotional state." (BR, Dkt. No. 34 at 22.) Shorn of the erroneous mental health finding, this conclusion is unwarranted. Moreover, as explained above, the Bankruptcy Court's own findings lead unavoidably to the conclusion that Mr. Rhodes has not maximized his income, but rather has purposely sought lower-paying home assistance jobs.

Finally, the Bankruptcy Court declined to weigh Mr. Rhodes's refusal to participate in the IBRP against him. The court cited "evidence presented and a legal argument made that inherently that forgiveness of indebtedness at the end of that period would result in discharge of indebtedness income to him resulting in income tax that would be owed at the end of the period." (BR, Dkt. No. 34 at 24.) But Mr. Rhodes did not submit evidence that he would incur such tax liability, despite the fact that he bore the burden of doing so, and the Ninth Circuit Bankruptcy Appellate Panel has discouraged speculation over the tax implications of participation in income-based repayment plans. *See In re Birrane*, 287 B.R. 490, 500 (9th Cir. BAP 2002). Other courts have emphasized that cancellation of debt after 25 years of participation in income-based plans only results in tax liability if the borrower's assets exceed his liabilities immediately prior to the cancellation of the debt. *See In re Jesperson*, 571 F.3d 775, 782 (8th Cir. 2009). The Bankruptcy Court erred in its evaluation of Mr. Rhodes's refusal to participate in the IBRP—a factor that reflects lack of good faith in attempting to repay his loans. Thus, Mr. Rhodes did not prove prong three by a preponderance of the evidence.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that Mr. Rhodes failed to meet his burden under each prong of the *Brunner* test. The Court REVERSES the decision of the Bankruptcy Court and holds Mr. Rhodes's student debt non-dischargeable.