**EDUCATIONAL CREDIT MANAGEMENT CORPORATION, Appellant/Defendant,**

v.

**Summer Lynn BEATTIE, Appellee/Plaintiff.**

**No. C12–59 MJP.**

United States District Court,
W.D. Washington,
at Seattle.

Dec. 17, 2012.

Julie K. Swedback, ECMC, Oakdale, MN, Michaelanne Ehrenberg, Karr Tuttle Campbell, Seattle, WA, for Appellant/Defendant.

Lawrence K. Engel, Bellevue, WA, for Appellee/Plaintiff.

## ORDER RE: APPEAL FROM BANKRUPTCY COURT

MARSHA J. PECHMAN, District Judge.

This matter came before the Court on an appeal from a final order entered by the U.S. Bankruptcy Court for the Western District of Washington. USBC Case No. 03–15393–KAO. Jurisdiction over this appeal is proper pursuant to 28 U.S.C. § 158(a). The Court has received and reviewed Appellant's Opening Brief (Dkt. No. 12), Appellee's Response Brief (Dkt. No. 13), Appellant's Reply Brief (Dkt. No. 16) and the administrative record in this matter, and enters the following order:

IT IS ORDERED that the ruling of the Bankruptcy Court is REVERSED in part (specifically, as regards Appellant/Defendant Educational Credit Management Corporation), and the Appellant's loan to Appellee is held to be nondischargeable.

IT IS FURTHER ORDERED that Appellee's loan from Appellant shall be repaid at the Income–Based Repayment (IBR) Plan rate of $165.75 per month.

### *Background*

*Plaintiff's history*[1]

Plaintiff is 35 years old, married to Michael Pinard; they are the parents of a young daughter. Mr. Pinard did not join in the bankruptcy petition; he is paying

1. Unless otherwise noted, all facts are drawn from the trial record.

off his own pre-marital student loans (there was a remaining balance of $18,000 at time of trial). They are currently living in Juneau, Alaska. Neither spouse has any medical condition which prevents them from working. Agreed Relevant Facts, Joint Pretrial Order, Dkt. No. 14–9, p. 3, ¶¶ 3–7.

Plaintiff has several undergraduate degrees as well as a graduate degree in naturopathic medicine from Bastyr University in Seattle, Washington (2004). She financed her post-secondary education through a series of loans from several lenders. The total debt amount is approximately $232,000; Defendant Educational Credit Management Corporation (ECMC) was owed $120,000 at the time of trial. Although some payments were made to the other loan-holders from 2005 to 2008, no payments have been made to ECMC since 2004.

Following graduation from Bastyr, the couple moved to Bellingham, Washington in 2005 and bought a condominium. Plaintiff moved up there believing that she could get a position in another naturopath's office. She volunteered at the office for two years before deciding it would not work out—she was also employed teaching exercise at a community college and working as a massage therapist in a spa during this period. In 2007, she opened her own naturopathic clinic. The venture was a failure—she generated little income and incurred additional debt. Her lack of suc-

cess finally drove her to close the practice in 2008 and file for Chapter 7 bankruptcy.

Since closing her private practice, Plaintiff has worked a variety of jobs, including counselor, massage therapist, substitute teacher and teaching assistant.[2] Mr. Pinard has supplemented the family income with short-term commercial fishing jobs in Alaska—he fished in 2007, 2008 and 2011, but not in 2009 and 2010.[3] When he fishes, he generates (by Plaintiff's estimate) an additional $6000–8000 annually.[4]

In May of 2010, Mr. Pinard lost his job in Bellingham due to layoffs. In June of that year, Plaintiff accepted an offer to work as a naturopath in Sitka, Alaska. The family rented out their Bellingham condominium and moved to Sitka. The job offer in the naturopathic clinic never materialized into full-time employment; the job was terminated after six weeks and Plaintiff again tried to establish a private practice of her own. She fared no better than before.

In August 2011, Mr. Pinard accepted a job in Juneau and the family relocated there, moving in with Plaintiff's parents where they resided up until the time of the trial (November 2011).[5] Plaintiff did not find employment in Juneau in the two months between moving there and the start of the bankruptcy trial. The Court notes, however, Plaintiff's testimony at trial that she did apply for a number of jobs in the health-related services (other naturopaths, Juneau Birth Center, Health & Human Services, SE Alaska Regional

2. Plaintiff also has experience as a nail technician, waitress, and jail guard. Trial Transcript I ("Trial Tr. I;" Dkt. No. 14–6), pp. 19, 22, 50, 56

3. Mr. Pinard did not fish in 2009 and 2010 because of physical concerns (and the birth of his daughter in 2009). Trial Transcript II ("Trial Tr. II," Dkt. No. 14–7), 77:16–23.

4. The Bankruptcy Court excluded Mr. Pinard's fishing income when calculating the

net household monthly income (calculating it at $5272; ECMC alleges that, with the fishing money factored in, that figure goes up to $5772–5938).

5. Although they agreed to pay $625/month, they had only made one payment at time of trial and Plaintiff testified that they would not be evicted for non-payment.

Health Consortium). Trial Tr. I, pp. 80–81.

She testified at trial that she believed she could not generate enough income as a naturopath to support her family. Mr. Pinard earns a monthly income of $4400 gross/$3922 net (including overtime). Other than a "very occasional" patient from her naturopathic practice, Plaintiff does not work outside the home.

Testimony at trial established their monthly household expenses to be $5093—this includes $625 in rent at her parents' house (which she testified they had only paid once by time of trial), plus organic food for their diet, "special" food for their dog and two cell phone plans. One of their expenses (Mr. Pinard's student loans; monthly payment of $337) will be paid off in four years.

*Bankruptcy trial*

The trial on Plaintiff's claim for an "undue hardship" discharge was held before U.S. Bankruptcy Judge Overstreet; the evidence consisted of the Joint Pretrial Order, the exhibits submitted by both parties, and the testimony of Plaintiff.

In considering Plaintiff's request for a "hardship discharge" of her education loans, the Bankruptcy Court found that Plaintiff met all three prongs of the undue hardship test (*see infra*), but found that it would not be equitable to grant a complete discharge. Instead, the Bankruptcy Court ordered Plaintiff to make payments of $180/month ($60 to each of the creditors) for 25 years with no interest. For ECMC, this amounted to an 85% reduction of the total money owed to them. ECMC alone appealed. For that reason, the effects of this order will only be applicable to it.

**Discussion/Analysis**

*Standard of review/Brunner "undue hardship" test*

■ We review the Bankruptcy Court's legal conclusions *de novo*; factual findings are reviewed for clear error. *U.S. v. Hatton*, 220 F.3d 1057, 1059 (9th Cir.2000). A bankruptcy court's remedies are reviewed for abuse of discretion. *In re Lopez*, 345 F.3d 701, 705 (9th Cir.2003).

■ Student loans are presumptively nondischargeable in bankruptcy. 11 U.S.C. § 523(a)(8). That presumption may be overcome by a showing of "undue hardship" on the debtor. *Id.* The Ninth Circuit applies the three-prong test developed by the Second Circuit in *Brunner v. New York State Higher Educ. Svcs. Corp.* (*In re Brunner*), 831 F.2d 395 (2d Cir. 1987); *see also In re Pena*, 155 F.3d 1108, 1111 (9th Cir.1998)(adopting *Brunner* for the Ninth Circuit). In order to qualify for an "undue hardship" discharge, Plaintiff is required to prove that

1) she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loan;

2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the loan; and

3) she has made good faith efforts to repay the loan.

*Pena*, 155 F.3d at 1111.

■ The debtor must prove every element of the *Brunner* test; "[i]f the debtor fails to satisfy any of these requirements, 'the bankruptcy court's inquiry must end there, with a finding of no dischargeability.'" *In re Rifino*, 245 F.3d 1083, 1088 (9th Cir.2001).

■ This is an intentionally high bar, reflective of the Congressional intent that repayment of these types of loans not be

easily avoided. The "existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans." *Pena*, 155 F.3d at 1111. Elsewhere it has been held that " 'undue hardship' contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy." *In re Naranjo*, 261 B.R. 248 (Bankr. E.D.Cal.2001) (*citing In re Brown*, 18 B.R. 219, 222 (Bankr.Kan.1982)).

*Prong 1: Maintenance of a minimal standard of living*

■ Satisfying the burden of proof on this element requires "more than a showing of tight finances," but stops short of "utter hopelessness." *In re Nascimento*, 241 B.R. 440, 445 (9th Cir. BAP 1999). While the benchmark for this prong does not require that a debtor live in abject poverty, "a minimal standard of living under . . . § 523(a)(8) does not equate to a middle class standard of living" either. *In re Howe*, 319 B.R. 886, 889 (9th Cir. BAP 2005).

Before the Court even reaches the question of Plaintiff's finances, there is a need to address two complicating factors that relate to how the Court calculates the effect of forced repayment on her standard of living.

First, since only ECMC appealed the Bankruptcy Court's ruling, this order will only take into consideration the effect upon Plaintiff of repaying the ECMC portion of her outstanding loans. Further, the Court will factor in, as part of her monthly expenses, the $120/month she has been ordered to repay the two other educational loan-holders.

Second, in accordance with ECMC's allegations in their pleadings, the Court is calculating the repayment of Defendant's loan at the rate resulting from the Income–Based Repayment (IBR) Plan; that is, $165.75/month for the next 25 years. Def. Trial Ex. D–9. ECMC argues convincingly (see *infra*) that this is the correct and permissible rate to use in the repayment calculation, and the Court agrees.

■ Turning to the Bankruptcy Court's findings (which Defendant challenges factually and legally), the Court first addresses the factual issue of whether the Bankruptcy Court correctly calculated the average monthly income of the family (which the findings fixed at $5272.60). Transcript of Ruling (Ruling), Dkt. No. 14–8, 7:20–22. ECMC challenges the failure to include Mr. Pinard's part-time fishing income, and the Court agrees that this exclusion was made in error (and quite possibly simply in oversight). The Bankruptcy Court recognized that Mr. Pinard periodically generated fishing income in its ruling: "They will have an additional $3,000 per year coming from the State of Alaska, *and they will have additional income from Mr. Pinard's annual fishing expeditions.*" Dkt. No. 14–8, Ruling, 22:10–13 (emphasis supplied). Interestingly, the bankruptcy judge then proceeded to factor the $3000 per year from the State of Alaska into the calculations of monthly income, but not Mr. Pinard's fishing earnings (thus the Court's speculation that this may have merely been an oversight in the Bankruptcy Court's calculations).

■ Plaintiff argues that, since the court must analyze a debtor's "current" income and expenses, the fact that Mr. Pinard was not engaged in fishing activities at the time of trial (November 2011) justifies the exclusion of his fishing income from the court's calculations. The Court disagrees—Mr. Pinard had fished in May 2011, which is sufficiently proximate in

time to be included as part of the family's "current" income.[6] As to Plaintiff's argument that her husband's fishing was too inconsistent (Mr. Pinard fished in 2007, 2008 and 2011, but not in 2009 and 2010), Plaintiff's own testimony was that her husband "tries" to go every year. Dkt. No. 14–7, Trial Tr. II, 59:6–8. Further, she testified that the only reason he did not go in 2009 and 2010 was that he was either injured or recovering from injury during that time, and his daughter was born in 2009. Trial Tr. II, Dkt. No. 14–7, 77:16–23.

The Court finds that the Bankruptcy Court's exclusion of the fishing income was clear error. The only evidence from the trial record of the amount of that income is Plaintiff's testimony that "it varies every year with what they catch and how much they sell it for. So probably in the same range, $6000 to $8000 total." Trial Tr. II, 60:1–3. Adding that amount into the Bankruptcy Court's calculation yields a monthly income between $5772.60 and $5938.10 (this cannot be said to truly represent a "net" income because presumably the fishing income of $6000–8000 is taxed). Nor does this Court feel compelled to arrive at a precise figure—our inquiry here is limited to whether, factoring in the fishing income, Plaintiff can make an income-based loan repayment and still maintain a "minimum" standard of living.

█ In addition to an erroneous calculation of Plaintiff's monthly income, the Bankruptcy Court also erred in its application of the "minimum standard of living" test (a conclusion of law which this Court reviews *de novo* ). In analyzing Plaintiff's budget, the Court concluded that "I don't see any real excesses in that budget."

Dkt. No. 14–8, Ruling, 15:4–6. The test is not whether there are any "excesses" in the debtor's budget. Testing for whether Plaintiff's family's current budget is below, at, or above a minimum standard of living

> ... requires the Court to compare their reasonably necessary expenses with their income and determine whether they have funds available to make payments on the student loan debt. [*footnote omitted* ] In conducting this analysis, *the Court must exclude claimed expenses if they are unnecessary to maintaining a minimal standard of living.*

*In re Berchtold,* 328 B.R. 808, 814 (Bankr.Idaho 2005)(emphasis supplied).

█ The one item in Plaintiff's budget which is most vulnerable to revision under this analysis is her grocery expenses. She claims $700/month in groceries and admitted at trial that (1) "we bought primarily organic food" and (2) that organic food is more expensive. Trial Tr. II, 35:23–36:8. She claims no medical necessity for this expense and the Court has no trouble finding, as a matter of law, that organic groceries are not "reasonably necessary" to a minimum standard of living.

Defendant attacks other expenses in Plaintiff's budget ($70/month for the dog's "special food," $50/month in "recreation expenses" including pony rides for the daughter, the family's two cell phone plans and, most significantly, the Bellingham condominium which represents a net loss of $741 monthly). The Court finds that these expenses are either *de minimis* or (in the case of the condominium) justifiable for other reasons (the mortgage is underwater and Mr. Pinard has a $35,000 second

---

**6.** "Although the *Brunner* test looks to the debtor's 'current' income and expenses, where the evidence suggests that the debtor's income or expenses tend to fluctuate, it is not inappropriate to average figures over a reasonable period of time." *Pena,* 155 F.3d at 1112.

mortgage which would then become a new liability upon the sale of the property). Regarding the cell phone plans, Defendant put forth no evidence in support of its position that there are less expensive alternatives. Therefore, the Court's ruling on Prong 1 is not based on any error regarding these other expenses.

Nevertheless, based on the lack of necessity and added expense of Plaintiff's organic food bill, in combination with the increased monthly income derived from the inclusion of Mr. Pinard's fishing earnings, the Court finds that the family can absorb an increased income-based repayment amount of $165.75/month and still maintain a minimum standard of living, and that the Bankruptcy Court's finding to the contrary was in error.

Plaintiff argues that the Court is required to use the original ECMC contract payment figure ($477/month) in making this calculation, but she provides no support for that position. By contrast, there are a number of cases where the IBR payment figure was used in the court's *Brunner* analysis.[7] Plaintiffs argument would yield an absurd result: almost every debtor would satisfy Prong 1 easily if courts were restricted to considering only the amount of their contract payment. Congress's creation of the flexible income-based repayment options (*see* 11 U.S.C. § 523(a)(8)) reflects an intent that debtors not be automatically or easily excused from their student loan obligations.

Defendant makes a weak secondary argument that Plaintiff has to prove that she has maximized her income in order to satisfy the requirements of Prong 1. The Ninth Circuit has already rejected a similar argument from this same defendant. *In re Mason,* 464 F.3d 878, 882 (9th Cir. 2006)("ECMC's contention that Mason

must establish that he maximized his income in order to meet the *first* prong of *Brunner* does not find support in the case law.") (emphasis in original).

But between the Bankruptcy Court's factual error regarding Plaintiff's monthly income calculation and the misapplication of the "minimum standard of living" analysis regarding Plaintiff's expenses, there is more than enough to find that Plaintiff did not in fact produce sufficient evidence to satisfy Prong 1 of *Brunner*.

*Prong 2: Additional circumstances indicating a persistent inability to pay*

▉ The burden of proof is on Plaintiff to establish circumstances (often described as "insurmountable barriers") that predict her ongoing inability to pay for a "significant portion of the loan's repayment period." *In re Nys,* 446 F.3d 938, 946 (9th Cir.2006). As the *Nys* court explained:

We recognize that courts have found it difficult to predict future income. Consequently, courts have required debtors to present "additional circumstances" to prove that their present financial situation will persist well into the future, preventing them from making payments throughout a substantial portion of the loans' repayment period. [*citation omitted.*] These "additional circumstances" are meant to be objective factors that courts can consider when trying to predict the debtor's future income; the debtor does not have a separate burden to prove "additional circumstances," beyond the inability to pay presently or in the future, which would justify the complete or partial discharge of her student loans.

*In re Nys,* 446 F.3d at 945.

The Bankruptcy Court ruling does reflect an understanding that Plaintiff will

---

7. *In re Birrane,* 287 B.R. 490 (9th Cir. BAP 2002); *ECMC v. Rhodes,* 464 B.R. 918, 926 (W.D.Wash.2012); *Dimoyannis v. Sallie Mae* *Serv.,* Case No. 09–04339, 2010 WL 1780098 (Bankr.N.D.Cal. Apr. 29, 2010).

work again at some point in the future, and probably not as a naturopath. ("The current prospects for Ms. Beattie in Alaska suggest that she will become employed again, but as a massage therapist." Ruling, 18:22–24.) The ruling includes the Court's conclusion that Plaintiff could expect to earn a gross income of approximately $20,000. *Id.* at 18:24–19:1.

Defendant challenges as error the Bankruptcy Court's further conclusion that, with day care and travel expenses factored in, Plaintiff's future income would generate "perhaps a couple of hundred extra dollars a month, which the couple will need to devote to their living quarters." *Id.*, 19:2–5. This Court agrees. The error lies in treating the child care expenses (which the Bankruptcy Court estimated at $1,000 a month; *Id.*, 18:14–15) as though they will continue indefinitely. This is clearly not the case. Plaintiff's daughter was two years old at the time of the trial which indicates that, at most, full-time child care will continue for another three years.

Plaintiff objects to Defendant's argument concerning the transitory nature of this expense, calling it "a bald assertion ... totally unsupported in the record." Reply, p. 23. Admittedly, Defendant could have developed this point further in cross-examination. However, this Court can take judicial notice of the fact that, in America, children are afforded free public education from the ages of approximately 5 to 18 and that, once Plaintiff's daughter is in school full-time, her child-care expenses will (at the very least) diminish, freeing up further funds for loan repayment.

The issue of rent (i.e., moving out of Plaintiff's parents' home), although somewhat problematic, does not preclude a finding in Defendant's favor on Prong 2. The Bankruptcy Court factored in a total of $825 for rental and related expenses ($625 as rent payment to Plaintiff's parents, plus $200/month to store their possessions; Ruling, 10:14–17) and the ruling contemplates that Plaintiff's family would at some point find their own living quarters. *See* Ruling, 19:4–5. The only evidence on the projected cost of renting their own place was Plaintiff's testimony (again, uncontroverted) that it would cost at least $1500/month. *Id.*, 10:18–20. Accepting that figure, it would represent a projected increase of $675/month upon moving out of the parents' residence.

Defendant argues that the "potential" of future rent does not amount to an "insurmountable barrier" because (1) Plaintiff is currently enjoying a low-rent/rent-free (she testified that her parents would not kick them out if they failed to pay) situation and (2) there is case law that future rent payments do not constitute "additional circumstances" that predict an ongoing inability to pay. The Court does not find that Defendant's cases support its argument [8] and is further not prepared to issue a ruling telling a debtor that she and her family *have* to live with her parents until her educational loan is paid off.

However, even assuming the advisability/inevitability of Plaintiff's family moving out on their own at some point, an increase of $675/month offset against the increased monthly income (the $20,000 annual income assumed by the Bankruptcy Court ruling represents a monthly gross income

---

8. *Sperrazza v. Univ. of Maryland,* Civ. No 07–792, 2008 WL 818616 (E.D.Pa. March 24, 2008) is (a) a District Court ruling in which (b) the debtor appeared to make no claim that his current rent-free circumstances would not persist; *ECMC v. Jesperson,* 571 F.3d 775 (8th Cir.2009) concerned a single man living with his brother, a circumstance which is distinguishable from a family of three living with a spouse's parents.

of $1666) which would be generated when Plaintiff returns to work does not constitute evidence of an additional circumstance which would prevent Plaintiff from making a further payment of $105/month [9] for the foreseeable future.

The Court finds that Plaintiff has not sustained her burden of producing "specific, articulable facts" (*ECMC v. Polleys*, 356 F.3d 1302, 1310 (10th Cir.2004)) of additional circumstances which predict an ongoing inability to repay her loan to Defendant. The Bankruptcy Court erred in not issuing a Prong 2 finding in favor of Defendant.

*Prong 3: Good faith repayment efforts*

■ "The good faith prong of the undue hardship test focuses on two factors: a debtor's efforts to obtain employment, maximize income and minimize expenses; and the debtor's efforts to negotiate a repayment plan." *In re Berchtold*, 328 B.R. 808, 816 –817 (Bankr.D.Idaho 2005) (*citing In re Mason*, 315 B.R. 554, 563 (9th Cir. BAP 2004)). *See also In re Birrane*, 287 B.R. 490, 499–500 (9th Cir. BAP 2002).

■ Defendant attacks Plaintiff's discharge and her proof on every one of these elements:

*Efforts to obtain employment/maximize income*

Everyone (including Plaintiff) agrees that her attempts to create a livelihood for herself as a naturopath were ultimately a failure. While there is a close question of whether she pursued her dream of establishing a naturopathic career after it was evident that there was no hope, the evidence (given the amount of time and effort she put into obtaining the degree) does not rise to a finding that her repeated attempts to make a living as a naturopath amount to a failure to maximize her income.

Nor does the Court find persuasive Defendant's argument that, given all her previous job experience and other training and skills, her history of seeking work in other areas compels a finding of failure to maximize income. The record actually contains a wealth of evidence (in the form of Plaintiff's uncontroverted testimony) that she sought and obtained alternative employment during the time she was volunteering at the naturopathic office in Bellingham (from 2005 to 2007; *see* Trial Tr. I, 44:18–45:45:2), as well as during the period between the closing of her private practice in Bellingham and the move to Sitka (2008–2010; *see* Trial Tr. I, 49:14–50:25).

Furthermore, as noted above, it appears from her testimony that in the two months she was in Juneau before the trial she made considerable efforts to locate employment. *See* Trial Tr. I, pp. 80–81 for Plaintiffs testimony regarding all the jobs she applied for (other naturopathic offices, the Juneau Birth Center, Health & Human Services, the SE Alaska Regional Health Consortium). Admittedly, these are all in the health-related services field, but in terms of maximizing her income the Court finds that those positions would pay as well or better than working as a massage therapist, nail technician, waitress, fitness instructor or jail guard.

This Court cannot find in Defendant's favor on the "failure to maximize income" element of Prong 3.

*Minimize expenses*

Based on the Prong 1 analysis *supra*, the Court concludes that Plaintiff did not

---

**9.** Having already been ordered to pay ECMC $60/month, this Court's requirement that she repay her loan to ECMC at the IBR rate of $165/month represents a monthly increase of $105.

produce sufficient evidence to establish that she minimized her expenses to the greatest extent possible. Plaintiff counters that Defendant has not produced any evidence regarding viable alternatives to the expenses which it attacks, but Defendant is correct that their burden of proof is not a factual one: their argument goes to the legal conclusion that Plaintiffs expenses (specifically, her organic food bill) were reasonably necessary to maintain a minimum lifestyle which (as previously discussed) the Court has ruled they are not.

*Efforts to negotiate a repayment plan*

The Bankruptcy Court in its ruling focused on Plaintiff's "good faith" efforts to repay the loans, finding that "she ha[d] made a small amount of payments and taken advantage of deferments" and did not have any "extra income" with which to repay the loans. On that basis, the Court ruled that she had satisfied Prong 3 of the *Brunner* test. Ruling, 21:15–21.

Defendant presented evidence at trial regarding the "Ford Program," a Congressionally-created program under which a borrower may choose from several flexible repayment options, including the Income–Based Repayment (IBR) Plan, which offers reduced payments for a fixed repayment term (25 years) after which the debt is retired. *See* Def. Trial Ex. D–9; *see also* 20 U.S.C. §§ 1087a, 1087e(d)(1); 34 C.F.R. § 685.100 *et seq.* Plaintiff does not challenge Defendant's calculation that, under an IBR plan, her repayment would be an estimated $165.75/month. She did testify that she rejected Defendant's offer to renegotiate her loan payment under the Ford Program, believing that her family could not afford it. Trial Tr. II, 77:4–15.

Defendant cites Plaintiff's refusal as evidence of her lack of good faith in repayment of the loan and challenges the Bankruptcy Court's finding of good faith as legal error. The Court's analysis of this portion of the Bankruptcy Court's ruling is complicated, however, by the fact that the bankruptcy judge was looking at Plaintiff's *entire* debt repayment picture, while Appellant bases its appeal solely on what Plaintiff owed and would have had to repay ECMC. The Bankruptcy Court had to consider whether, in light of everything she owed, Plaintiff's decision to (1) repay certain of her educational lenders and not others (i.e., ECMC) and (2) decline to restructure her loan payments with Appellant amounted to a bad faith refusal to negotiate a payment plan.

ECMC's appeal does not, in fact, analyze Plaintiff's ability to pay in the context of everything she owed. Its argument focuses exclusively on the relatively small increase ($105.75) between the amount that the Bankruptcy Court found she could pay and the amount of her monthly repayment under an IBR plan. The Bankruptcy Court had to consider whether, taking into account *all* the moneys she owed, Plaintiff's refusal to renegotiate with ECMC was in bad faith and ultimately concluded that it was not. This Court is not prepared, in the much narrower context of an analysis devoted solely to Appellant's loan, to rule that the Bankruptcy Court's finding in this regard was in error.

Considering that, of the commonly-used factors employed to analyze whether a debtor has satisfied Prong 3 of the *Brunner* test, ECMC only appears to have succeeded in establishing that Plaintiff did not minimize her expenses, this Court finds that Defendant has not succeeded in demonstrating that the Bankruptcy Court erroneously found in Plaintiff's favor concerning Prong 3.

### Conclusion

As mentioned at the outset of this order, the debtor must prove every element of the *Brunner* test; "[i]f the debtor fails to

**592**

satisfy any of these requirements, 'the [ ] court's inquiry must end there, with a finding of no dischargeability.' " *In re Rifino,* 245 F.3d 1083, 1088 (9th Cir.2001). Based on this Court's conclusion that Plaintiff did not succeed in carrying her burden of proof on Prongs 1 and 2, a ruling that her loan from Defendant is not dischargeable in bankruptcy is compelled. Since the remaining creditors did not appeal, the Bankruptcy Court's finding to contrary as regards their loans will not be disturbed, but ECMC's request on appeal is GRANTED.

Plaintiff's student loan from Defendant/Appellant ECMC is found nondischargeable and she is ordered to commence repayment of that loan at the IBR rate asserted by Defendant. All other IBR terms and requirements (i.e., no interest on the loan and retirement of the loan after 25 years) will likewise be enforced.

The clerk is ordered to provide copies of this order to all counsel.